Nos. 13-2054 and 13-2055
[ORAL ARGUMENT REQUESTED]

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

RON PETERSON FIREARMS, LLC,

Plaintiff-Appellant,

v.

B. TODD JONES, ACTING DIRECTOR, BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,

Defendant-Appellee.

DALE RUTHERFORD, D/B/A THE COP SHOP; TRACY RIFLE AND PISTOL INC.,

Plaintiffs-Appellants,

v.

B. TODD JONES, ACTING DIRECTOR, BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,

Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
Hon. Judith C. Herrera for Hon. John Edwards Conway, United States District Judge
Case Nos. 11-CV-678, 12-CV-167

**BRIEF FOR THE APPELLEE**

STUART F. DELERY
  *Acting Assistant Attorney General*

KENNETH J. GONZALES
  *United States Attorney*

MICHAEL S. RAAB
  (202)-514-4053
ANISHA S. DASGUPTA
  (202) 514-5428
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7237*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

# TABLE OF CONTENTS

**<u>Page</u>**

STATEMENT OF RELATED CASES

GLOSSARY

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF THE ISSUES....................................................................2

STATEMENT OF THE CASE .....................................................................2

STATEMENT OF FACTS ..........................................................................4

I.      Statutory And Regulatory Background ....................................................4

II.     Factual Background ...............................................................................10

        A.      Gun Tracing..............................................................................10

        B.      Firearms Trafficking Along The Southwestern Border.............13

III.    Prior Proceedings.................................................................................20

SUMMARY OF ARGUMENT....................................................................21

STANDARD OF REVIEW .........................................................................25

ARGUMENT .............................................................................................25

I.      ATF Acted Within Its Statutory Authority In Issuing The
        Demand Letter ......................................................................................25

        A.      The Demand Letter Is Authorized Under Section
                923(g)(5)(A)..............................................................................25

        B.      The Demand Letters Are Fully Consistent With 18
                U.S.C. § 923(g)(1)(A), (g)(1)(B), (g)(3), and (g)(7) ...............34

C.      Section 926(a) Does Not Apply To ATF's Demand
        Letter Authority.................................................................................37

D.      The July 2011 Demand Letter Does Not Violate An
        ATF Appropriations Rider That Restricts The
        Consolidation Of Records..............................................................38

II.     ATF's Decision To Issue The Letters To A Certain Class Of
        Dealers Was Not Arbitrary Or Capricious ............................................40

CONCLUSION .....................................................................................................50

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND
TYPE STYLE REQUIREMENTS

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                          <u>Page</u>

*American Bankers Association v. National Credit Union Administration,*
    05-CV-2247, 2008 WL 2857678 (M.D. Pa. July 21, 2008)...........................................45

*Bar MK Ranches v. Yuetter,*
    994 F.2d 735 (10th Cir. 1993) ....................................................................................47

*Blaustein & Reich, Inc. v. Buckles,*
    365 F.3d 281 (4th Cir. 2004) ................................................17, 20, 21, 22, 23, 24, 25, 28,
                                                  29, 34, 35, 37, 38, 39, 48

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ...................................................................................................47

*Garcia v. Int'l Elevator Co., Inc.,*
    358 F.3d 777 (10th Cir. 2004) ....................................................................................49

*Hillsdale Environmental Loss Prevention, Inc. v. U.S. Army Corps of Engineers,*
    702 F.3d 1156 (10th Cir. 2012) ............................................................................24, 25, 40

*Int'l Ladies' Garment Workers' Union v. Donovan,*
    722 F.2d 795 (D.C. Cir. 1983) ...................................................................................45

*J&G Sales Ltd. v. Truscott,*
    473 F.3d 1043 (9th Cir. 2007)......................................................9, 10, 12, 20, 23, 24, 26,
                                                28, 34, 35, 36, 37, 38, 39

*Leather Indus. of Am., Inc. v. EPA,*
    40 F.3d 392 (D.C. Cir. 1994) .....................................................................................41

*MacKay v. Drug Enforcement Administration,*
    664 F.3d 808 (10th Cir. 2011) ................................................................................ 40, 43

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................................ 40, 45

*Nat'l Shooting Sports Foundation, Inc. v. Jones*,
   Nos. 12-5009 and 12-5010, — F.3d —,
   2013 WL 2360953 (D.C. Cir. May 31, 2013) ...................3, 5, 6, 7, 10, 11, 12, 13, 14,
                                15, 16, 17, 18, 19, 21, 22, 23, 24,
                                25, 26, 27, 28, 31, 33, 34, 35, 36,
                                37, 39, 40, 41, 42, 43, 44, 45, 46, 48

*Ratzlaf v. United States*,
   510 U.S. 135 (1994) ...........................................................................................28

*Reedy v. Werholtz*,
   660 F.3d 1270 (10th Cir. 2011) ........................................................................49

*RSM, Inc. v. Buckles*,
   254 F.3d 61 (4th Cir. 2001) ..................................3, 7, 9, 21, 23, 34, 35, 36, 39

*U.S. Postal Service v. Gregory*,
   534 U.S. 1 (2001) ...............................................................................................49

*United States v. Armstrong*,
   517 U.S. 456 (1996) ...........................................................................................49

*United States v. Chemical Foundation, Inc.*,
   272 U.S. 1 (1926) ...............................................................................................49

*WorldCom, Inc. v. FCC*,
   238 F.3d 449 (D.C. Cir. 2001) .........................................................................41

**Statutes:**

5 U.S.C. § 552a(a)(5) .................................................................................................49

5 U.S.C. § 552a(a)(7) .................................................................................................49

5 U.S.C. § 552a(b) ......................................................................................................49

5 U.S.C. § 552a(b)(3) .................................................................................................49

5 U.S.C. § 552a(e)(4)(D) ...........................................................................................49

18 U.S.C. § 922(a)(1) .............................................................................5

18 U.S.C. § 922(b)(5) .............................................................................5

18 U.S.C. § 923(a) .................................................................................5

18 U.S.C. § 923(g) ..............................................................................5, 8

18 U.S.C. § 923(g)(1) .....................................................................5, 20, 23

18 U.S.C. § 923(g)(1)(A) ..................................................8, 20, 29, 34, 35

18 U.S.C. § 923(g)(1)(B) .....................................................8, 20, 34, 35

18 U.S.C. § 923(g)(3) ...........................................................................34

18 U.S.C. § 923(g)(3)(A) .......................................9, 11, 20, 23, 27, 32, 33

18 U.S.C. § 923(g)(5) ...........................................................................28

18 U.S.C. § 923(g)(5)(A) ...........................2, 9, 22, 25, 29, 30, 34, 37

18 U.S.C. § 923(g)(7) .....................................................11, 20, 23, 34, 47

18 U.S.C. § 923(j) ................................................................................44

18 U.S.C. § 926 .....................................................................................5

18 U.S.C. § 926(a) .......................................................................8, 10, 20

28 U.S.C. § 1291 ...................................................................................2

28 U.S.C. § 1331 ...................................................................................1

Cal. Penal Code § 27535(b)(8) ..............................................................33

Cal. Penal Code § 28050 .......................................................................33

Pub. L. No. 90-351, 82 Stat. 197 (1968) .................................................4

Pub. L. No. 90-618, 82 Stat. 1213 (1968) ...............................................4

Pub. L. No. 99-308, 100 Stat. 449 (1986) ............................................................ 7, 8

Pub. L. No. 103-322, 108 Stat. 1796 (1994) ....................................................... 11

Pub. L. No. 107-296, 116 Stat. 2135 (2002) ..................................................... 5, 6

Pub. L. No. 112-55, 125 Stat. 552 (2011) ..................................................... 10, 38

**Regulations:**

27 C.F.R. part 178 ...........................................................................................7

27 C.F.R. § 178.126(a) ................................................................................ 7, 9

27 C.F.R. part 478 ...........................................................................................7

27 C.F.R. § 478.124 ...........................................................................29, 30, 34

27 C.F.R. § 478.124(c)(1) .............................................................................19

27 C.F.R. § 478.124(e) ..................................................................................19

27 C.F.R. § 478.125(e) ..................................................................................19

27 C.F.R. § 478.126(a) ....................................................................................7

28 C.F.R. § 0.130(a)(1) ....................................................................................6

33 Fed. Reg. 18,555 (Dec. 14, 1968) .......................................................... 6, 7

37 Fed. Reg. 11,696 (June 10, 1972) .............................................................6

40 Fed. Reg. 19,201 (May 2, 1975) .......................................7, 9, 11, 27, 32, 36

68 Fed. Reg. 3,551 (Jan. 24, 2003) .............................................................49

68 Fed. Reg. 3,744 (Jan. 24, 2003) ..............................................................7

**Legislative Material:**

H.R. Rep. No. 90-1577 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4410.........................4, 44

H.R. Rep. No. 108-576 (2004) ........................................................................48

S. Rep. No. 89-1866 (1966) ...........................................................................44

S. Rep. No. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112.....................................5

S. Rep. No. 112-158 (2012)............................................................................48

**Other Authorities:**

Bureau of Alcohol, Tobacco, Firearms and Explosives, *Q & As for the Report of Multiple Sale or Other Disposition of Certain Rifles*, https://www.atf.gov/files/firearms/industry/080911-qa-multiple-rifles.pdf (last visited July 5, 2013) .................................................31

Federal Firearms License (FFL) Types, *available at* http://www.atf.gov/about/foia/ffl-list.html ...............................................19

## STATEMENT OF RELATED CASES

This case has not previously been before any court other than the district court.

The defendant-appellee in this case is defendant-appellee in a D.C. Circuit case and a

Fifth Circuit case raising the same issues as this case and involving the same counsel.

*See 10 Ring Precision, Inc. v. Jones*, No. 12-50742 (5th Cir.) (oral argument held Apr. 2,

2013); *Nat'l Shooting Sports Foundation, Inc. v. Jones*, Nos. 12-5009 and 12-5010, — F.3d

—, 2013 WL 2360953, at *11 (D.C. Cir. May 31, 2013) (*NSSF*).

**GLOSSARY**

| | |
|---|---|
| Appx | Appellants' Appendix |
| ATF | Bureau of Alcohol, Tobacco, Firearms, and Explosives |
| FFL | Federal Firearms Licensee |
| FOPA | The Firearms Owners' Protection Act of 1986 |
| GAO | United States Government Accountability Office |
| OIG | Office of the Inspector General, U.S. Department of Justice |

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————

Nos. 13-2054 and 13-2055

———————

RON PETERSON FIREARMS, LLC,

Plaintiff-Appellant,

v.

B. TODD JONES, ACTING DIRECTOR, BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES,

Defendant-Appellee.

———————

DALE RUTHERFORD, D/B/A THE COP SHOP; TRACY RIFLE AND
PISTOL INC.,

Plaintiffs-Appellants,

v.

B. TODD JONES, ACTING DIRECTOR, BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES,

Defendant-Appellee.

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
Hon. Judith C. Herrera for Hon. John Edwards Conway, United States District Judge
Case Nos. 11-CV-678, 12-CV-167

———————

**BRIEF FOR APPELLEE**

———————

**JURISDICTIONAL STATEMENT**

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331.

Appellants' Appendix ("Appx") 17, 28. On March 27, 2013, the district court granted

defendant's motion for summary judgment.  Appx 56.  Plaintiffs filed a timely notice of appeal on March 28, 2013.  Appx 10.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

In an effort to improve its ability to investigate and combat the illegal trafficking of firearms along and across the southwest border, the Bureau of Alcohol, Tobacco, Firearms, and Explosives sent a letter to federal firearms licensees located in Arizona, California, New Mexico, and Texas.  The letter required licensed firearms dealers and pawnbrokers in those States to report information on multiple sales of semi-automatic rifles with certain specified characteristics.  The issues on appeal are:

1. Whether 18 U.S.C. § 923(g)(5)(A) authorizes the Bureau to issue such letters to federal firearms licensees.

2. Whether the Bureau's decision to issue the letter to this class of licensees was arbitrary or capricious.

## STATEMENT OF THE CASE

The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") is charged with administering the Gun Control Act, and one of the agency's central responsibilities under that statute is the tracing of firearms recovered during a law enforcement investigation in order to identify potential violations of federal firearms

laws. *RSM, Inc. v. Buckles,* 254 F.3d 61, 63 (4th Cir. 2001). Recently, "[p]ublic safety along the U.S.-Mexico border has deteriorated considerably" as Mexican drug trafficking organizations use U.S.-sourced firearms "against other [drug trafficking organizations], the Mexican Military, Mexican and U.S. law enforcement officials, as well as innocent civilians on both sides of the border." Appx 612; *see also* Appx 633. Texas, Arizona, California, and New Mexico have been the top sources of firearms — including rifles — recovered in Mexico and traced by ATF to non-licensed purchasers. *See* Appx 254-303, 473, 656, 740; *see also Nat'l Shooting Sports Foundation, Inc. v. Jones*, Nos. 12-5009 and 12-5010, — F.3d —, 2013 WL 2360953, at *11 (D.C. Cir. May 31, 2013) (*NSSF*).

ATF and other government agencies determined that ATF's efforts to investigate and combat arms trafficking across and along the southwest border were hindered by the lack of data on multiple sales of the semi-automatic rifles increasingly used by Mexican drug cartels. Appx 464, 613, 664, 821; *see also NSSF*, 2013 WL 2360953, at *3. ATF accordingly sought information on multiple sales of such rifles by licensed firearms dealers and pawnbrokers in Arizona, California, New Mexico, and Texas. Appx 80; *see also NSSF*, 2013 WL 2360953, at *4. The letters sent to these federal firearms licensees required them to report "whenever, at one time or during any five consecutive business days, [they] sell or otherwise dispose of two or more

3

semi-automatic rifles capable of accepting a detachable magazine and with a caliber greater than .22 (including .223/5.56 caliber) to an unlicensed person." Appx 80.

The recipients of these letters included plaintiffs, who are Dale Rutherford, doing business as The Cop Shop, and Ron Peterson Firearms, LLC — federally licensed firearms dealers located in New Mexico — and Tracy Rifle and Pistol, Inc., a federally licensed firearms dealer located in California. Appx 16, 28, 57. Plaintiffs' suit alleges that ATF lacked statutory authority to issue the letter and that ATF's decision to issue the letter to this class of licensees was arbitrary and capricious. Appx 59. The district court granted ATF's motion for summary judgment. Appx 78. This appeal followed.

## STATEMENT OF FACTS

### I.      Statutory And Regulatory Background.

**A.**   Congress enacted the Gun Control Act of 1968 "to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence," Pub. L. No. 90-618, § 101, 82 Stat. 1213, 1213 (1968), by "strengthen[ing] Federal controls over interstate and foreign commerce in firearms," H.R. Rep. No. 90-1577 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4410, 4411. *See also* Omnibus Crime Control and Safe Streets Act, Pub. L. No. 90-351, § 901(a)(1), (3), 82 Stat. 197, 225 (1968) (finding that state law was not adequately controlling the "widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce" and that

4

"only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the businesses of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with").

The Act requires a person to obtain a federal license before engaging in the business of manufacturing, importing, or dealing in firearms in interstate or foreign commerce. 18 U.S.C. §§ 922(a)(1), 923(a); *see also NSSF*, 2013 WL 2360953, at *1. The licensee must create and maintain records of all firearms transactions, including the name, age, and place of residence of individual firearms purchasers. 18 U.S.C. §§ 922(b)(5), 923(g); *see also NSSF*, 2013 WL 2360953, at *1.

Congress anticipated that complete and accurate records of firearms purchases would provide an effective tool in assisting state and local law enforcement authorities to trace guns used in crime. S. Rep. No. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2168. Accordingly, Congress required licensees to submit certain reports and information, 18 U.S.C. § 923(g), provided for the inspection of the records kept by federal firearms licensees, 18 U.S.C. § 923(g)(1), and authorized the promulgation of rules and regulations to implement the provisions of the Act, *see* 18 U.S.C. § 926.

Authority to enforce federal firearms laws was originally vested in the Secretary of the Treasury but was transferred to the Attorney General by the Homeland Security Act of 2002, Pub. L. No. 107-296, § 1111, 116 Stat. 2135, 2274; *see also NSSF*,

5

2013 WL 2360953, at *1 n.2.  This authority has been delegated to the Bureau of Alcohol, Tobacco, Firearms, and Explosives (formerly the Bureau of Alcohol, Tobacco, and Firearms).  Treasury Dep't Order No. 221, 37 Fed. Reg. 11,696 (June 10, 1972); 28 C.F.R. § 0.130(a)(1); *see also NSSF*, 2013 WL 2360953, at *1 n.2.[1]

**B.**  In December 1968, the Department of the Treasury issued regulations implementing the Gun Control Act and establishing the framework for requesting and obtaining information from federal firearms licensees.  33 Fed. Reg. 18,555, 18,571 (Dec. 14, 1968); *see also NSSF*, 2013 WL 2360953, at *1.  One of the regulations provided, in relevant part:

> Each licensee shall, when required by letter issued by the Assistant Regional Commissioner, and until notified to the contrary in writing by such officer, submit on Form 4483, Report of Firearms Transactions, for the periods and at the times specified in the letter issued by the Assistant Regional Commissioner, all record information required by this subpart, or such lesser record information as the Assistant Regional Commissioner in his letter may specify.

---

[1]  The Homeland Security Act of 2002 divided the Bureau of Alcohol, Tobacco, and Firearms into two separate entities, the Bureau of Alcohol, Tobacco, Firearms, and Explosives in the Department of Justice, and the Tax and Trade Bureau in the Department of the Treasury.  Homeland Security Act of 2002, Pub. L. No. 107-296, § 1111, 116 Stat. 2135, 2274-75.  The Act transferred the Bureau's authority under the Gun Control Act to the new ATF in the Department of Justice.  *Ibid.*  The Act also amended the Gun Control Act by replacing references to the Secretary of the Treasury with references to the Attorney General.  *Id.* § 1112, 116 Stat. 2275-79.

33 Fed. Reg. at 18,571. The regulation previously appeared at 27 C.F.R. § 178.126(a) and is currently codified at 27 C.F.R. § 478.126(a).[2]

In 1975, the Bureau of Alcohol, Tobacco, and Firearms issued regulations requiring the reporting of the "sale or other disposition of two or more pistols or revolvers [to the same person] at one time, or during any five consecutive business days." 40 Fed. Reg. 19,201, 19,201 (May 2, 1975). Licensees were required to report "the name, address and identification of the purchaser and a statement of the quantity and type of the pistols and revolvers involved in the multiple sale" in order "to enable ATF to monitor and deter illegal interstate commerce in pistols and revolvers by unlicensed persons." *Ibid.*

**C.** The Firearms Owners' Protection Act of 1986 ("FOPA"), Pub. L. No. 99-308, 100 Stat. 449, was enacted "to reduce the regulatory burden on law-abiding firearms owners without incapacitating ATF's ability to combat violations of the firearms laws." *NSSF*, 2013 WL 2360953, at *1 (quoting *RSM, Inc. v. Buckles*, 254 F.3d 61, 64 (4th Cir. 2001)).

---

[2] After enactment of the Homeland Security Act of 2002, the Departments of the Treasury and Justice redesignated 27 C.F.R. part 178 as 27 C.F.R. part 478. 68 Fed. Reg. 3,744, 3,750 (Jan. 24, 2003). 27 C.F.R. § 478.126(a) uses the term "Director of Industry Operations" instead of the term "Assistant Regional Commissioner," but is otherwise identical in all material respects to the provision promulgated in 1968.

As relevant to this case, FOPA amended the Gun Control Act by adding various provisions to 18 U.S.C. § 923(g) and 18 U.S.C. § 926(a). Pub. L. No. 99-308, 100 Stat. 454-55, 459-60. Section 923(g)(1)(A) requires a licensee to maintain "records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Attorney General may by regulations prescribe." 18 U.S.C. § 923(g)(1)(A). The provision further states that licensees "shall not be required to submit to the Attorney General reports and information with respect to such records and the contents thereof, except as expressly required by this section." *Ibid.* The provision also authorizes the Attorney General to conduct a physical inspection of a licensee's records or inventory "when he has reasonable cause to believe a violation of this chapter has occurred and that evidence thereof may be found on such premises," and obtains "a warrant authorizing entry" beforehand. *Ibid.*

The provision at 18 U.S.C. § 923(g)(1)(B) authorizes inspection of a licensee's "inventory and records" without "reasonable cause or warrant . . . (i) in the course of a reasonable inquiry during the course of a criminal investigation of a person or persons other than the licensee," (ii) "for ensuring compliance with the record keeping requirements of this chapter . . . not more than once during any 12-month period," or (iii) "when such inspection or examination may be required for

determining the disposition of one or more particular firearms in the course of a bona fide criminal investigation."

Section 923(g)(3) codified ATF's 1975 regulation requiring the reporting of the "sale or other disposition of two or more pistols or revolvers [to the same person] at one time, or during any five consecutive business days," 40 Fed. Reg. 19,201. The provision requires licensees to "prepare a report of multiple sales or other dispositions whenever the licensee sells or otherwise disposes of, at one time or during any five consecutive business days, two or more pistols, or revolvers, or any combination of pistols and revolvers totalling two or more, to an unlicensed person." 18 U.S.C. § 923(g)(3)(A). The report must be submitted "not later than the close of business on the day that the multiple sale or other disposition occurs." *Ibid.*

Section 923(g)(5) "'essentially codified' 27 C.F.R. § 178.126(a), [the] 1968 regulation requiring [licensees] to submit record information when the Bureau seeks it." *J&G Sales Ltd. v. Truscott,* 473 F.3d 1043, 1048 n.3 (9th Cir. 2007) (quoting *RSM, Inc. v. Buckles,* 254 F.3d 61, 64 (4th Cir. 2001)). Section 923(g)(5)(A) states:

> Each licensee shall, when required by letter issued by the Attorney General, and until notified to the contrary in writing by the Attorney General, submit on a form specified by the Attorney General, for periods and at the times specified in such letter, all record information required to be kept by this chapter or such lesser record information as the Attorney General in such letter may specify.

18 U.S.C. § 923(g)(5)(A).

The final FOPA provision of relevance here is 18 U.S.C. § 926(a). That provision states in relevant part:

> No . . . rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act [May 19, 1986] may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established.

18 U.S.C. § 926(a).

**D.** Since fiscal year 1979, Congress has included a restriction in the annual appropriations legislation governing ATF that "forbid[s] the Bureau from establishing a national firearms registry." *J&G Sales*, 473 F.3d at 1045. Similar to earlier years, the appropriations legislation for the current fiscal year prohibits the expenditure of appropriated funds "in connection with consolidating or centralizing, within the Department of Justice, the records, or any portion thereof, of acquisition and disposition of firearms maintained by Federal firearms licensees." Consolidated and Further Continuing Appropriations Act of 2012, Pub. L. No. 112-55, 125 Stat. 552, 609 (2011).

## II.    Factual Background.

### A.  Gun Tracing.

Law enforcement agencies frequently rely on firearm trace investigations conducted by ATF. *NSSF*, 2013 WL 2360953, at *2. Firearm tracing is "the

10

systematic tracking of the movement of a firearm recovered by law enforcement officials." Appx 646 n.3; *see also NSSF*, 2013 WL 2360953, at *2. Tracing information is used by law enforcement for purposes that include linking a suspect to a firearm in a criminal investigation, identifying potential firearms traffickers, and detecting patterns in the sources and kinds of firearms that are used in crime. Appx 486, 646; *see also NSSF*, 2013 WL 2360953, at *2. Before 1994, federal law did not require firearms licensees to respond to tracing requests from ATF within a specified period of time. In 1994, Congress amended the Gun Control Act to require licensees to respond to ATF's crime gun trace requests within 24 hours of receiving notification of the request. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110306, 108 Stat. 1796, 2013-14 (codified at 18 U.S.C. § 923(g)(7)).

Licensee reporting of multiple sales of firearms to a single unlicensed person "helps expedite the time required by ATF to complete a crime gun trace." Appx 664. Since 1975, licensees have been required to report information on sales of multiple pistols and revolvers to a single unlicensed person within five consecutive business days. 40 Fed. Reg. 19,201 (May 2, 1975); 18 U.S.C. § 923(g)(3)(A). Multiple sales reports are entered into ATF's Firearms Tracing System at the end of the day on which they are received, and made available to all ATF field divisions. Appx 508-09, 819. When a firearm is recovered by law enforcement officials, specific identifying information relating to the firearm (including its serial number and model) is entered

into the ATF Firearms Tracing System.  Appx 486, 509, 650-51; *see also NSSF*, 2013 WL 2360953, at *2; *J&G Sales,* 473 F.3d at 1045.  "If a trace request is matched to multiple sales report information, the trace can be completed in minutes rather than days or weeks."  Appx 509; *see also* Appx 664.

If a firearm is not part of a multiple sales report, ATF must contact the manufacturer or importer, then the wholesaler (if applicable), and then the retail dealer to identify the purchaser.  Appx 509 n.53; *see also NSSF*, 2013 WL 2360953, at *3; *J&G Sales,* 473 F.3d at 1045-46.  "[T]he length of time this process takes varies widely, but is usually about 7 to 10 days."  Appx 509 n.53; *see also NSSF*, 2013 WL 2360953, at *2.  However, "investigative leads obtained from trace results are most useful within the first few days following a firearm seizure, in part because the sort of conspiracies often associated with firearms trafficking tend to change personnel frequently and, as a result, an individual found to be responsible for the purchase of a particular firearm may no longer have ties to the principal gun trafficker directing the scheme."  Appx 662.

Multiple sales reports thus enable ATF investigators to quickly identify the purchaser of a "crime gun" without having to contact every entity in the firearm's distribution chain to complete a trace.  Appx 509, 661-62; *see also NSSF*, 2013 WL 2360953, at *3.  ATF also uses multiple sales reports to verify gun dealers' records, to detect unlawful activity, and to generate investigative leads regarding straw purchasers

and trafficking patterns.  Appx 508.  "[M]ultiple sales or purchases of firearms by a nonlicensee [are] a significant indicator of firearms trafficking."  Appx 664 (quotation marks omitted); *see also* Appx 842 (the purchase of "a large number of the same model firearm, or similar firearms" at one time is a "key indicator[]" of firearms trafficking).

### B. Firearms Trafficking Along The Southwestern Border.

1.  In May 2007, the Acting Director of ATF traveled to Mexico City to confer with Mexican law enforcement officials about strategies "to reduce the flow of illegal guns from the United States to Mexico."  Appx 834.  In February 2008, ATF's Assistant Director for Field Operations testified before a congressional committee on the "flow of U.S. sourced firearms into Mexico for use by major drug trafficking organizations" and the "related violence . . . threatening the well being and safety of citizens on both sides of the border."  Appx 611, 612; *see also NSSF*, 2013 WL 2360953, at *1.  He explained that "analysis of firearms trace data over the past three years show[ed] that Texas, Arizona and California are the three most prolific source states, respectively, for firearms illegally trafficked to Mexico."  Appx 613; *see also* Appx 656, 740.  In addition, "recent trace data of firearms seized in Mexico and 'Stateside' interdictions of firearms bound for Mexico show[]" that drug cartels had

increasingly "developed a preference" for certain "higher quality, more powerful" long guns. Appx 613; *see also* Appx 510, 653; *see also NSSF*, 2013 WL 2360953, at *1.[3]

ATF's congressional testimony noted that "the tracing of firearms" was an "essential component" of ATF's efforts to "reconstruct the flow of weapons along the border, how and where they are being purchased, and who is purchasing them." Appx 614. In ATF's experience, "seizing firearms through interdiction without thoroughly investigating the supply and trafficking infrastructure accomplishes little in terms of 'tangibly' affecting the flow of firearms to Mexico." Appx 613. ATF was thus "focusing [its] limited industry operations resources on and near the border

---

[3] Although this trace data "only represents data from gun trace requests submitted from seizures in Mexico and not all the guns seized, it is currently the only systematic data available." Appx 652. "In 2008," for example, "of the almost 30,000 firearms . . . seized, only around 7,200 or approximately a quarter, were submitted to ATF for tracing." *Ibid.* Data in the Administrative Record regarding firearms recovered in Mexico and successfully traced is accurate as of the dates of the documents in the Administrative Record. However, because of the manner in which some components of ATF compile trace data, some numbers are potentially subject to change pending the possible recovery of additional firearms that may be successfully traced. ATF's Violent Crime Analysis Branch organizes trace data results by the calendar year in which the firearm was recovered, not the year in which the trace was initiated. For example, if a firearm was recovered in 2010 but the trace was not initiated until 2011, the data results will be organized by the year of recovery, 2010. Thus, if a firearm for which a trace is initiated in later years is determined by the Violent Crime Analysis Branch to have been recovered in 2010, the raw trace numbers for 2010 will increase in later trace data reports by the Branch. Accordingly, the trace numbers for a past calendar year may increase.

14

region" where most of the guns trafficked to Mexico were shown to originate.  Appx 615.

In June 2009, the Government Accountability Office ("GAO") transmitted a report to Congress identifying and analyzing problems that ATF was experiencing in combatting arms trafficking from the United States to Mexico.  Appx 632-714 (GAO, *Firearms Trafficking: U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges* (2009)).  The report noted that "violence associated with Mexican [drug trafficking organizations] poses a serious challenge for U.S. law enforcement, threatening citizens on both sides of the border," Appx 633, and that "[f]rom fiscal year 2004 to fiscal year 2008, most of the firearms seized in Mexico and traced came from U.S. Southwest border states.  In particular, about 70 percent of these firearms came from Texas, California, and Arizona."  Appx 655.

The GAO report identified the absence of a multiple sales reporting requirement for long guns as a particular challenge to ATF's efforts to combat arms trafficking from the United States to Mexico.  Appx 664; *see also NSSF*, 2013 WL 2360953, at *3.  The GAO report noted that, although "ATF has identified multiple sales or purchases of firearms by a nonlicensee as a 'significant indicator' of firearms trafficking," and "the federal multiple sale reporting requirement helps expedite the time required by ATF to complete a crime gun trace, . . . . the requirement does not apply to purchases of long guns."  Appx 664.  "As a result, although according to

15

ATF data about 27 percent of firearms recovered in Mexico and traced from fiscal year 2004 to fiscal year 2008 were long guns, ATF does not have information in its multiple sales database on any long guns recovered in crime in Mexico that may have been purchased through a multiple sale." *Ibid.* GAO's recommendations included a recommendation that the Attorney General investigate "approaches to address the challenges law enforcement officials raised in this report regarding the constraints on the collection of data that inhibit the ability of law enforcement to conduct timely investigations." Appx 695; *see also NSSF*, 2013 WL 2360953, at *3.

In November 2010, the Office of the Inspector General of the United States Department of Justice ("OIG") issued a review of ATF's efforts to combat firearms trafficking along and across the southwest border, Appx 459-610, which included a finding that "the lack of a reporting requirement for multiple sales of long guns," which cartels have used with increasing frequency, "hinders ATF's ability to disrupt the flow of illegal weapons into Mexico." Appx 464; *see also* Appx 508-09; *NSSF*, 2013 WL 2360953, at *3. "OIG's analysis of National Tracing Center data of Mexican crime guns recovered from FY 2004 through FY 2009" revealed that "the percentage of crime guns recovered in Mexico that were long guns steadily increased each year from 20 percent in FY 2004 to 48 percent in FY 2009." Appx 510; *see also NSSF*, 2013 WL 2360953, at *3. "[OIG's] analysis also found that long guns tend to have a shorter time-to-crime than handguns, and shorter time-to-crime intervals

16

generate more valuable leads for ATF." Appx 510; *see also NSSF*, 2013 WL 2360953, at *3.[4] In addition, evidence showed "that Mexican cartels are obtaining long guns in multiple sales." Appx 510; *see also NSSF*, 2013 WL 2360953, at *3. In one case study discussed by the OIG review, a firearms trafficking ring "purchased at least 336 weapons, of which . . . 251 (75 percent) were long guns" and "[o]f the 251 long guns, all but 1 were purchased as a part of multiple sales." Appx 510-11.

The OIG review thus concluded "that mandatory reporting of long gun multiple sales could help ATF identify, investigate, and refer for prosecution individuals who illegally traffic long guns into Mexico." Appx 511-12. The OIG review accordingly recommended that ATF "explore options for seeking a requirement for reporting multiple sales of long guns." Appx 512, 566; *see also NSSF*, 2013 WL 2360953, at *3. In response, ATF noted that some of these options "may require a change to the *Gun Control Act,* which is beyond ATF's and the Department's authority," but "stated that it would explore the full range of options to seek information regarding multiple sales of long guns." Appx 599; Appx 510; *see also NSSF*, 2013 WL 2360953, at *3.

---

[4] "Time-to-crime" refers to the amount of time that elapses between a firearm's first retail sale and its recovery at a crime scene. *See, e.g., Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 285 (4th Cir. 2004).

2.   ATF took action to address these recommendations by publishing in the Federal Register a request for public comment on a proposal to require licensed dealers and pawnbrokers in the southwestern border States to report "whenever the licensee sells or otherwise disposes of two or more rifles with the following characteristics: (a) Semi-automatic; (b) a caliber greater than .22 (including .223/5.56 caliber); and (c) the ability to accept a detachable magazine, to the same person at one time or during any five consecutive business days."  Appx 810; *see also NSSF*, 2013 WL 2360953, at *4.[5]  The agency explained that "ATF has long used multiple sales information to detect, investigate and prevent firearms trafficking," and that multiple sales reports "provide ATF with potential intelligence and almost real-time investigative leads that can indicate illegal firearms trafficking."  Appx 817.

"The goal of the current proposal," ATF explained, "is to ensure that ATF receives multiple sale reports on the specific types of long guns used by Drug Trafficking Organizations in Mexico and along the southwest border."  Appx 819-20. ATF explained that "[f]ailure to collect this information is likely to hinder ongoing law enforcement efforts to combat firearms trafficking and reduce violent crime along the southwest border and in Mexico," thereby "pos[ing] a threat to public safety and

---

[5] As ATF explained, a notice and comment procedure was used because this "information collection request [was being submitted] to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act."  Appx 810; *see also* Appx 756.

national security." Appx 821. ATF noted that "licensees are already familiar with the multiple sale reporting requirement for handguns and should have no problem completing the Form 3310.12, which is modeled" on the form for reporting multiple handgun sales. *Ibid.*

The Federal Register notice provided a 60-day period for public comment. Appx 810; *see also NSSF*, 2013 WL 2360953, at *4. ATF subsequently issued a second notice allowing an additional 30 days for public comment. Appx 810; *see also NSSF*, 2013 WL 2360953, at *4.

In July 2011, ATF sent demand letters to "licensed dealers and pawnbrokers in Arizona, California, New Mexico, and Texas." Appx 80; *see also NSSF*, 2013 WL 2360953, at *4. The letters required the licensees to report "whenever, at one time or during any five consecutive business days, [they] sell or otherwise dispose of two or more semi-automatic rifles capable of accepting a detachable magazine and with a caliber greater than .22 (including .223/5.56 caliber) to an unlicensed person." Appx 80; *see also NSSF*, 2013 WL 2360953, at *4.[6]

---

[6] Federal firearms licensees fall into various categories, including: dealers of firearms other than destructive devices (Type 01); pawnbrokers of firearms other than destructive devices (Type 02); collectors of curios and relics (Type 03); manufacturers of ammunition for firearms (Type 06); manufacturers of firearms other than destructive devices (Type 07); importers of firearms other than destructive devices (Type 08); dealers in destructive devices (Type 09); manufacturers of destructive devices (Type 10); and importers of destructive devices (Type 11). *See* Federal Firearms License (FFL) Types, *available at* http://www.atf.gov/about/foia/ffl-

## III.   Prior Proceedings

In this action for declaratory and injunctive relief, plaintiffs — federally licensed firearms dealers located in New Mexico and California — contend that ATF lacks statutory authority to request the information sought in the July 2011 demand letter and that ATF's decision to issue the letter to this class of licensees was arbitrary and capricious.  Appx 57, 59; *see also* Appx 16, 28.  The complaints raise challenges to the demand letter under 18 U.S.C. § 923(g)(1)(A), (g)(1)(B), (g)(3)(A), and (g)(7), 18 U.S.C. § 926(a), and ATF's appropriations rider.  Appx 22-23, 35-38.

The district court denied plaintiffs' motion to exclude the portions of the administrative record referencing the tracing of firearms recovered in Mexico by ATF, Appx 52-55, and granted summary judgment in favor of ATF, Appx 56.  The court rejected plaintiffs' argument that ATF's demand letters were inconsistent with 18 U.S.C. § 923(g)(1), (g)(3), and (g)(7), and 18 U.S.C. § 926(a), noting that the Fourth and Ninth Circuit have both upheld the authority of the Bureau to issue such letters and that plaintiffs here repeat arguments rejected by those Courts.  Appx 68-77 (discussing *J&G Sales Ltd. v. Truscott,* 473 F.3d 1043 (9th Cir. 2007); *Blaustein & Reich,*

---

list.html.  ATF's regulations provide details about the records to be kept by each licensee category.  *See, e.g.,* 27 C.F.R. §§ 478.124(c)(1) & (e), 478.125(e).  The demand letters at issue here were sent to Type 01 and Type 02 licensees in the four southwest border States.

*Inc. v. Buckles,* 365 F.3d 281 (4th Cir. 2004); *RSM, Inc. v. Buckles,* 254 F.3d 61 (4th Cir. 2001)).

The court similarly rejected plaintiffs' argument that the demand letter exceeded the scope of ATF's statutory authority under Section 923(g)(5)(A), noting that the Gun Control Act requires licensees to record "information about the purchaser and the gun any time a licensee transfers a firearm to a non-licensee" and "[t]he Demand Letter requires a limited subset of this information." Appx 67. The court also rejected plaintiffs' contention that the demand letter violated the restriction on consolidation of records in ATF's appropriations rider, explaining that "Congress clearly did not envision that the annual appropriations rider would prohibit a small collection of records," and that "the Demand Letter merely requires [licensees] in four states to report multiple sales of specified types of rifles to the same unlicensed person within a certain time frame." Appx 75. The court further held that ATF's decision to issue the demand letter was not arbitrary and capricious under the Administrative Procedure Act. Appx 76-77.

## SUMMARY OF ARGUMENT

The D.C. Circuit recently sustained the very same demand letter at issue in this case, *see Nat'l Shooting Sports Foundation, Inc. v. Jones,* Nos. 12-5009 and 12-5010, 2013 WL 2360953 (D.C. Cir. May 31, 2013), and there is no reason to reach any different result here. The Gun Control Act and its implementing regulations require federal

firearms licensees to maintain information about firearms purchases and sales.  Appx 80; *see also NSSF*, 2013 WL 2360953, at \*5.  The statute further requires licensees to provide the Bureau of Alcohol, Tobacco, Firearms, and Explosives with "all record information required to be kept" under the Act, "or such lesser record information" that the agency requests by letter.  18 U.S.C. § 923(g)(5)(A).  Congress thus "gave [ATF] broad authority to seek, by demand letter, all record information that [federal firearms licensees] are required to maintain," *Blaustein & Reich, Inc. v. Buckles,* 365 F.3d 281, 286 (4th Cir. 2004), and that authority "unambiguously" extends to the demand letter, *NSSF*, 2013 WL 2360953, at \*6.

**A.**  ATF issued the demand letters to facilitate its efforts to combat firearms trafficking along and across the southwest border.  The letters request licensees in the southwest border States to submit record information about multiple sales of rifles with certain specified characteristics.  As the district court observed, "the Demand Letter seeks information that [licensees] are already required to maintain," because the information to be reported is already captured on ATF's Form 4473.  Appx 67; *see also NSSF*, 2013 WL 2360953, at \*5.  Moreover, "because ATF sent the demand letter to only seven percent of FFLs nationwide and required information on only a small number of transactions, the July 2011 demand letter does not come close to creating a 'national firearms registry.'"  *NSSF*, 2013 WL 2360953, at \*10.

Plaintiffs' statutory challenges to ATF's authority are identical to the arguments rejected by the D.C. Circuit in the *National Shooting Sports Foundation* case. And as the D.C. Circuit recognized, these arguments are also fundamentally indistinguishable from arguments rejected by the Fourth Circuit and Ninth Circuit when those courts upheld two similar ATF demand letters, *see NSSF*, 2013 WL 2360953, at *7-10 (discussing *J&G Sales Ltd. v. Truscott,* 473 F.3d 1043 (9th Cir. 2007); *Blaustein & Reich, Inc. v. Buckles,* 365 F.3d 281 (4th Cir. 2004); *RSM, Inc. v. Buckles,* 254 F.3d 61 (4th Cir. 2001))).

A demand letter authorized under Section 923(g)(5)(A) is fully consistent with "the plain language of § 923(g)(1)(A), which protects [licensees] from reporting requirements 'except as expressly required by this section.'" *Blaustein & Reich*, 365 F.3d at 287; *accord NSSF*, 2013 WL 2360953, at *9. And "[s]imply because" 18 U.S.C. § 923(g)(3)(A) and (g)(7) "impose specific duties upon [licensees] to respond to certain requests within a specified time frame and to provide record information sua sponte does not mean that the Bureau is prohibited from seeking further [licensee] record information by demand letter." *J&G Sales*, 473 F.3d at 1050; *accord NSSF*, 2013 WL 2360953, at *8.

Section 923(g)(1)'s specification "govern[ing] when Bureau officials may physically gain entry onto [licensee] premises in order to inspect record information" does not apply "[w]hen the Bureau merely sends a demand letter requesting certain

23

limited information" because "no physical intrusion whatsoever occurs." *J&G Sales*, 473 F.3d at 1050; *accord NSSF*, 2013 WL 2360953, at *7. Likewise, "[b]y the very terms of the statute," Section 926(a) "cannot be understood to limit the Bureau's authority to issue demand letters under either § 923(g)(5)(A) or [ATF's regulatory authority]." *J&G Sales*, 473 F.3d at 1051; *accord NSSF*, 2013 WL 2360953, at *10; *see also Blaustein & Reich*, 365 F.3d at 288, 290.

   **B.** Plaintiffs are similarly misguided in attacking the reasonableness of ATF's decision to issue the letter to the selected subset of federal firearms licensees. "The [agency's] decision is entitled to a presumption of regularity, and it finds support in the record." *Hillsdale Environmental Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156, 1181 (10th Cir. 2012). As part of its efforts to investigate and disrupt firearms trafficking to Mexican drug cartels, ATF sought information from licensees in the top four source States for all firearms recovered in Mexico that were submitted for tracing and successfully traced to non-licensed purchasers between December 1, 2006 and August 31, 2010. *NSSF*, 2013 WL 2360953, at *11. "ATF's decision to direct its July 2011 demand letter to FFLs based on their geographic location was therefore not arbitrary and capricious," *id.* at *12, and the district court correctly rejected plaintiffs' attempt to second-guess the agency's determination.

## STANDARD OF REVIEW

The district court's grant of summary judgment is subject to de novo review.

*See, e.g., Hillsdale Environmental Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156, 1164 (10th Cir. 2012).

## ARGUMENT

### I.  ATF Acted Within Its Statutory Authority In Issuing The Demand Letter.

#### A.   The Demand Letter Is Authorized Under Section 923(g)(5)(A).

Through 18 U.S.C. § 923(g)(5)(A), "Congress gave [ATF] broad authority to seek, by demand letter, all record information that [federal firearms licensees] are required to maintain" *Blaustein & Reich, Inc. v. Buckles,* 365 F.3d 281, 286 (4th Cir. 2004). ATF's July 2011 demand letter properly exercised that authority to require licensed firearms dealers to report record information "only about a limited subset of firearms transactions." *NSSF*, 2013 WL 2360953, at *6. Contrary to plaintiffs' assertions (Peterson Br. 6-7), "the Bureau, when acting pursuant to § 923(g)(5)(A), is not restricted to issuing demand letters in connection with a criminal investigation or to noncompliant [licensees]," *Blaustein & Reich*, 365 F.3d at 287-88; *accord NSSF*, 2013 WL 2360953, at *8.

1. The "flow of U.S. sourced firearms into Mexico for use by major drug trafficking organizations" and the "related violence . . . threatening the well being and safety of citizens on both sides of the border" is a serious concern for U.S. law

enforcement officials. Appx 611, 612; *see also* Appx 633; *NSSF*, 2013 WL 2360953, at *1. Texas, Arizona, California, and New Mexico have been the top source locations for firearms — including rifles — recovered in Mexico and successfully traced by ATF to non-licensed purchasers. *See* Appx 254, 473, 656, 740; *NSSF*, 2013 WL 2360953, at *11.

ATF and other government agencies studying the problem determined that ATF's efforts to investigate and combat arms trafficking across and along the southwest border were hindered by the lack of data on multiple sales of the semi-automatic rifles increasingly used by Mexican drug cartels. Appx 464, 613, 664, 821; *see also NSSF*, 2013 WL 2360953, at *3. "[T]he tracing of firearms" is an "essential component" of ATF's efforts to "reconstruct the flow of weapons along the border, how and where they are being purchased, and who is purchasing them." Appx 614; *see also NSSF*, 2013 WL 2360953, at *1-3. And licensee reporting of multiple sales of firearms to a single unlicensed person "helps expedite the time required by ATF to complete a crime gun trace." Appx 664. If a firearm is not part of a multiple sales report, ATF must contact the manufacturer or importer, then the wholesaler (if applicable), and then the retail dealer to identify the purchaser. Appx 509 n.53; *see also NSSF*, 2013 WL 2360953, at *2-3; *J&G Sales,* 473 F.3d at 1045-46. "[T]he length of time this process takes varies widely, but is usually about 7 to 10 days." Appx 509 n.53; *see also NSSF*, 2013 WL 2360953, at *2.

Multiple sales reports thus enable ATF investigators to quickly identify the purchaser of a "crime gun" without having to contact every entity in the firearm's distribution chain to complete a trace.  Appx 509, 661-62.  ATF also uses those reports to generate investigative leads regarding straw purchasers and trafficking patterns.  Appx 508, 664.

Since 1975, federal firearms licensees have been required to report information on sales of multiple pistols and revolvers to a single unlicensed person within five consecutive business days.   40 Fed. Reg. 19,201 (May 2, 1975); 18 U.S.C. § 923(g)(3)(A).   "[T]he requirement does not apply to purchases of long guns," however.  Appx 664.  Thus, although "long guns tend to have a shorter time-to-crime than handguns," Appx 510, and "the percentage of crime guns recovered in Mexico that were long guns steadily increased each year from 20 percent in FY 2004 to 48 percent in FY 2009," Appx 510, ATF lacked "information in its multiple sales database on any long guns recovered in crime in Mexico that may have been purchased through a multiple sale."   Appx 664; *see also* Appx 510-11 (discussing evidence showing "that Mexican cartels are obtaining long guns in multiple sales"); *NSSF*, 2013 WL 2360953, at *3 (same).

ATF and other government agencies studying the problem therefore concluded that "the lack of a reporting requirement for multiple sales of long guns," which cartels have used with increasing frequency, "hinders ATF's ability to disrupt the flow

of illegal weapons into Mexico," Appx 464, and "that mandatory reporting of long gun multiple sales could help ATF identify, investigate, and refer for prosecution individuals who illegally traffic long guns into Mexico," Appx 511-12. *See also* Appx 508-09, 821; *NSSF*, 2013 WL 2360953, at *3. To that end, ATF sought information from licensed dealers and pawnbrokers in the southwest border States of California, Texas, Arizona, and New Mexico —the top source locations for handguns and rifles recovered in Mexico and successfully traced by ATF to non-licensed purchasers. *See* Appx 254, 473, 656, 740; *see also NSSF*, 2013 WL 2360953, at *11. The letters sent to these licensees required them to report "whenever, at one time or during any five consecutive business days, [they] sell or otherwise dispose of two or more semi-automatic rifles capable of accepting a detachable magazine and with a caliber greater than .22 (including .223/5.56 caliber) to an unlicensed person." Appx 80. ATF explained in the letters that the information was being requested under 18 U.S.C. § 923(g)(5), "[t]o assist [ATF's] efforts in investigating and combating the illegal movement of firearms along and across the Southwest border." Appx 80.

2.    As the D.C. Circuit recently explained, the Gun Control Act "unambiguously authorizes the demand letter" being challenged by plaintiffs in this case. *NSSF*, 2013 WL 2360953, at *6.[7] Section 923(g)(5)(A) vests ATF with "broad

---

[7] Like the Fourth Circuit and the Ninth Circuit, the D.C. Circuit declined to "'resort to legislative history to cloud a statutory text that is clear,'" *NSSF*, 2013 WL

authority to seek, by demand letter, all record information that [federal firearms licensees] are required to maintain," *Blaustein & Reich,* 365 F.3d at 286, including "such lesser record information as [ATF] in such letter may specify," 18 U.S.C. § 923(g)(5)(A). There can be no dispute that the information sought by ATF in the July 2011 demand letter falls within the scope of the record information that federal firearms licensees are required to maintain.

The Gun Control Act requires licensees to maintain records of "receipt, sale, or other disposition of firearms . . . as [ATF] may by regulations prescribe." 18 U.S.C. § 923(g)(1)(A). Included among these records is a Firearms Transaction Record, ATF Form 4473, that must be completed any time a licensee transfers a firearm to a non-licensee. 27 C.F.R. § 478.124. Form 4473 requires the licensee to record certain information about the transferee including the transferee's name, address, date and place of birth. *Ibid.*; Appx 84. Form 4473 also requires the licensee to record the date and location of the sale, the "[t]ype of firearm(s) to be transferred" — "Handgun," "Long Gun (*rifles or shotguns*)," or "Other Firearm (*Frame,*

---

2360953, at *9 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994)). *See also Blaustein & Reich*, 365 F.3d at 288 n.15 ("Because we find the statute unambiguous on its face, we do not resort to legislative history to determine what Congress intended its enactments to mean" but instead "derive the meaning of the enactment solely from the plain meaning of the words Congress used.") (citation omitted); *J&G Sales*, 473 F.3d at 1050 ("Because we find that — even after considering § 923(g)(5)(A) in its broader context — the statute is clear, we need not address J&G's exhaustive discussion of 18 U.S.C. § 923's legislative history.")

*Receiver, etc.* . . .)" — and the firearm's manufacturer, importer, type, model, gauge or caliber, and serial number.  27 C.F.R. § 478.124; Appx 84-86.

The demand letter requires licensees in the four target States to submit a subset of this record information when within a five-day period a licensee sells to the same person two or more long guns that are "semi-automatic" and "capable of accepting a detachable magazine" "with a caliber greater than .22 (including .223/5.56 caliber)," Appx 80.  Specifically, ATF's Form 3310.12 (Report of Multiple Sale or Other Disposition of Certain Rifles), requires the licensee to report record information about the transferee along with the date and location of the sales, and the firearm's manufacturer, importer, model, and caliber.  Appx 82.

All of the information requested by the demand letter appears on the Form 4473 that licensees are already required to maintain.  Plaintiffs' argument accordingly fails in light of Section 923(g)(5)(A)'s clear grant of authority to ATF to request by letter "all record information required to be kept by this chapter *or such lesser record information as [ATF] in such letter may specify.*"  18 U.S.C. § 923(g)(5)(A) (emphasis added).

Plaintiffs are not aided by their assertion (Peterson Br. 4, 9) that the Form 4473 "do[es] not require recording of the firearm's type of action . . . or type of ammunition feeding source."  The relevant inquiry under the statute is whether the letter seeks "record information" about a specific subset of firearms, not whether the

specific criteria defining the subset (*e.g.*, semi-automatic rifles pursuant to this reporting requirement or secondhand firearms acquired in 1999 pursuant to a previous reporting requirement) is itself information specifically "required to be kept" by licensees.  As the D.C. Circuit recently observed, the "July 2011 demand letter's conditions precedent are not being used to require additional information from FFLs, but instead limit the scope of the information demanded." *NSSF*, 2013 WL 2360953, at *6.[8]

Plaintiffs' other attacks on the demand letter's reporting requirements also lack merit.  Plaintiffs object (Peterson Br. 15-16) to the demand letter's timeframe for submitting multiple sales reports and to the attendant logistics of compliance for licensees who happen not to complete their Forms 4473 promptly or keep these forms in chronological order.  But these objections do not cast doubt on ATF's

---

[8] As the D.C. Circuit also explained, ATF could reasonably expect licensees to recognize when "a rifle's type of action and ammunition feeding source" would qualify for the reporting requirement. *NSSF*, 2013 WL 2360953, at *7.  "To argue . . . that an FFL — who purchases and sells firearms for a living — would price and sell rifles without knowing its type of action and ammunition feeding source blinks reality." *Ibid.*; *see also ibid.* (noting that licensees must keep a record of the "serial number, manufacturer and/or model name" of the rifles they sell).  The D.C. Circuit further observed that "assuming an FFL could somehow not determine the characteristics of his own rifles, ATF provides a web site and telephone number that the FFL can use to obtain assistance in determining whether a rifle is 'semi-automatic' and 'capable of accepting a detachable magazine.'" *Ibid.* (citing Bureau of Alcohol, Tobacco, Firearms and Explosives, *Q & As for the Report of Multiple Sale or Other Disposition of Certain Rifles*, https://www.atf.gov/files/firearms/industry/080911-qa-multiple-rifles.pdf (last visited July 5, 2013)).

31

authority to issue the demand letter because Congress did not limit ATF to requesting information only in the manner that a licensee happens to keep it.

Congress left the time frame of any required reporting to ATF's discretion. ATF, in turn, based the format and time frame of the demand letter's reporting requirement on the format and time frame for licensee reporting of multiple sales of pistols or revolvers. Congress has provided that licensees must "prepare a report of multiple sales or other dispositions whenever the licensee sells or otherwise disposes of, *at one time or during any five consecutive business days*, two or more pistols, or revolvers, or any combination of pistols and revolvers totalling two or more, to an unlicensed person." 18 U.S.C. § 923(g)(3)(A) (emphasis added). The report must be submitted "*not later than the close of business on the day that the multiple sale or other disposition occurs*." *Ibid.* (emphasis added). This timely reporting of multiple sales facilitates ATF's ability to monitor and deter illegal commerce in firearms by providing "potential intelligence and almost real-time investigative leads that can indicate illegal firearms trafficking." Appx 817; *see also* 40 Fed. Reg. 19,201 (reporting requirement on multiple sales of pistols and revolvers).

As ATF has explained, "adding a reporting requirement for certain types of rifles [is] something licensees already understand and should not impose an undue burden." Appx 818. "All Federal firearms licensees have been required to notify ATF of multiple handgun purchases since 1975 and therefore are familiar with the

32

form and how to complete it." Appx 817; *see also* Appx 821 (noting that ATF's Form 3310.12 (Report of Multiple Sales or Other Disposition of Certain Rifles) "is modeled" on ATF's Form 3310.4 (Report of Multiple Sale or Other Disposition of Pistols and Revolvers)). "Many licensees also utilize commercial software that automatically identifies multiple sales and completes the form required to report them." Appx 817-18.[9]

As the D.C. Circuit emphasized, "[t]he fact that an FFL chooses to keep his records in alphabetical or numerical order does not mean that the FFL can complain if his choice may not always be the least burdensome." *NSSF*, 2013 WL 2360953, at *6. Even if the demand letter's reporting requirement requires some extra effort on the part of the dealer, the information reported still falls within the definition of record information required to be kept by ATF's Form 4473. Appx 84-86. As the D.C. Circuit explained, "in determining the number of business days between sales to the same person, the FFL can examine both the sale date and the customer name,

---

[9] This is true even of federal firearms licensees based in California. Although California law provides that licensees may not sell an unlicensed individual more than one handgun within a thirty-day period, California law permits private individuals to agree to a sales transaction involving multiple sales of handguns if a California licensee participates in all such transactions. *See* Cal. Penal Code §§ 27535(b)(8), 28050. In such instances, because state law specifically provides for the private seller to deliver the handguns to the licensee, and for the licensee to deliver the handguns to the private buyer, the licensee has "dispose[d]" of multiple handguns to an unlicensed person, and is thus required to complete a multiple sales report under 18 U.S.C. § 923(g)(3)(A).

information he is required to record pursuant to 27 C.F.R. § 478.124." *NSSF*, 2013 WL 2360953, at *6.

### B. The Demand Letters Are Fully Consistent With 18 U.S.C. § 923(g)(1)(A), (g)(1)(B), (g)(3), and (g)(7).

Plaintiffs' claims that 18 U.S.C. § 923(g)(1)(A), (g)(1)(B), (g)(3), and (g)(7) limit ATF's demand letter authority are identical to the arguments rejected by the D.C. Circuit when that court upheld the demand letter that is also being challenged in this case, *see NSSF*, 2013 WL 2360953, at *7-9. And as the D.C. Circuit recognized, these arguments are also fundamentally indistinguishable from arguments rejected by the Fourth Circuit and Ninth Circuit when those courts upheld two similar ATF demand letters, *see id.* at *7-10 (discussing *J&G Sales Ltd. v. Truscott,* 473 F.3d 1043 (9th Cir. 2007); *Blaustein & Reich, Inc. v. Buckles,* 365 F.3d 281 (4th Cir. 2004); *RSM, Inc. v. Buckles,* 254 F.3d 61 (4th Cir. 2001)).

1. The statutory language makes clear that a demand letter authorized by 18 U.S.C. § 923(g)(5)(A) is consistent with 18 U.S.C. § 923(g)(1)(A)'s provision that licensees "shall not be required to submit to [ATF] reports and information with respect to such records and the contents thereof, except as expressly required by this section." As the D.C. Circuit recently explained, "'it is certainly true that § 923(g)(1)(A) limits the Bureau's ability to procure information from FFLs to the express requirements of § 923, but it does not eviscerate the content of

34

§ 923(g)(5)(A).'" *NSSF*, 2013 WL 2360953, at *9 (quoting *J&G Sales*, 473 F.3d at 1049 (brackets omitted)). The statute "expressly grants authority under section 923(g)(5)(A) to require disclosure of information *via* a demand letter." *Ibid.* As the Fourth and Ninth Circuits have emphasized, "'§ 923(g)(5)(A) contains an *express requirement* that is provided for in § 923(g)(1)(A).'" *J&G Sales*, 473 F.3d at 1049 (quoting *Blaustein & Reich*, 365 F.3d at 287 n.14).

ATF's July 2011 demand letter authority is also consistent with Section 923(g)(1)'s specification of the circumstances under which ATF may conduct a physical inspection of a licensee's inventory and records, and plaintiffs are misguided in arguing otherwise (Peterson Br. 23-25). As the D.C. Circuit recently noted, that argument "erroneously conflates provisions that apply in two different contexts." *NSSF*, 2013 WL 2360953, at *7. The inspection provisions of 18 U.S.C. § 923(g)(1)(A) and (B) are "'aimed at preventing warrantless, *on-site* searches of FFLs' records'" whereas "'issuance of a letter under section 923(g)(5)(A) does not involve the entry of ATF agents onto an FFL's premises.'" *Ibid.* (quoting *RSM,* 254 F.3d at 66 (brackets omitted) and citing *J&G Sales,* 473 F.3d at 1050).

2. Plaintiffs are likewise incorrect in arguing (Peterson Br. 22-23, 25-27) that Section 923(g)(5)(A) is limited by the reporting requirements at Section 923(g)(3)(A) and Section 923(g)(7). "Simply because some provisions of § 923 impose specific duties upon [licensees] to respond to certain requests within a specified time frame

35

and to provide record information sua sponte does not mean that the Bureau is prohibited from seeking further [licensee] record information by demand letter." *J&G Sales*, 473 F.3d at 1050.

As the D.C. Circuit has explained, "section 923(g)(7)'s specific trace request requirements do not purport to bear on section 923(g)(5)(A)'s demand letter requirements." *NSSF*, 2013 WL 2360953, at *8; *see also RSM*, 254 F.3d at 66 ("Section 923(g)(7) does not purport either to address or restrict [ATF's] section 923(g)(5)(A) authority to issue letters."). Section 923(g)(7) "serves quite [a] distinct purpose[] from the demand letter," in that it "imposes speedy reporting requirements on [licensees] in the context of criminal investigations, and neither explicitly nor implicitly serves to limit the Bureau's power under § 923(g)(5)(A)." *J&G Sales*, 473 F.3d at 1050.

Similarly, Section 923(g)(3)(A) evidences Congress's approval of ATF's longstanding requirement that licensees report multiple sales of pistols and revolvers, as expressed through Congress's codification of a 1975 ATF regulation requiring such reports, *see* 40 Fed. Reg. 19,201. There is no merit to plaintiffs' claim (Peterson Br. 22) that this provision "limit[s] reports of multiple sales of a type of firearm to handguns." In stating that "[e]ach licensee shall prepare a report of multiple sales . . .," Section 923(g)(3)(A) plainly establishes a requirement for licensees, rather than a limit on the agency's authority. As the D.C. Circuit recently explained, "because the Congress imposes a duty in one circumstance does not mean that it has

36

necessarily foreclosed the agency from imposing another duty in a different

circumstance.  Instead, the Congress may have meant that in the second context the

choice should be up to the agency."  *NSSF*, 2013 WL 2360953, at *8 (internal

quotation marks omitted).  And "[i]n section 923(g)(5)(A), the Congress authorized

ATF to require additional reporting beyond the reporting required in section

923(g)(3)(A)."  *Ibid.*

## C.    Section 926(a) Does Not Apply To ATF's Demand Letter Authority.

Section 926(a), enacted in 1986, "prohibits the Bureau or any other federal

agency from promulgating any new rules or regulations that would create a national

firearms registry."  *Blaustein & Reich*, 365 F.3d at 288.  As the D.C. Circuit has

explained, the argument that Section 926(a) restricts ATF's demand letter authority

(Peterson Br. 28-30) "fails under the plain text of this provision" because "[t]he

demand letter is not a rule or regulation and, therefore, section 926(a) does not apply"

and also because "the authority on which ATF relies to issue the demand letter, 18

U.S.C. § 923(g)(5)(A), is itself a statutory provision, not a regulation."  *NSSF*, 2013

WL 2360953, at *10; *see also J&G Sales*, 473 F.3d at 1051 (same); *Blaustein & Reich*, 365

F.3d at 290 (same).  The Fourth and Ninth Circuits have made clear that "§ 926(a) has

no bearing on [ATF's regulatory authority to issue demand letters] because it prohibits

the promulgation of rules and regulations prescribed only after May 19, 1986, and the

regulation at issue dates back to 1968." *J&G Sales*, 473 F.3d at 1051; *see also Blaustein*
*& Reich*, 365 F.3d at 288. In sum, Section 926(a) is directed to post-1986 regulations
of general applicability, not to (1) specific requests for information (2) issued to a
subset of licensees (3) under ATF's longstanding demand letter authority, which
Congress codified in Section 923(g)(5)(A) through the same legislation that enacted
Section 926(a).

> **D.    The July 2011 Demand Letter Does Not Violate An ATF**
> **Appropriations Rider That Restricts The Consolidation Of**
> **Records.**

Since fiscal year 1979, Congress has included a provision in ATF's annual
appropriations legislation that prohibits the agency from spending money "in
connection with consolidating or centralizing, within the Department of Justice, the
records, or any portion thereof, of acquisition and disposition of firearms maintained
by Federal firearms licensees." *See, e.g.*, Consolidated and Further Continuing
Appropriations Act of 2012, Pub. L. No. 112-55, 125 Stat. 552, 609 (2011). "The
plain meaning of consolidating or centralizing does not prohibit the mere collection
of some limited information" because "[b]oth consolidating and centralizing connote
a large-scale enterprise relating to a substantial amount of information." *Blaustein &*
*Reich*, 365 F.3d at 289; *see also id.* at 289 n.16 ("Because we conclude that the meanings
of consolidating and centralizing are unambiguous, we cannot resort to legislative
history to determine the meaning of the words."). As the D.C. Circuit recently

concluded, ATF's July 2011 demand letter requests information concerning only a very limited category of long guns and is therefore consistent with the rider. *NSSF*, 2013 WL 2360953, at *10.[10]

As the D.C. Circuit explained, there is no merit to the argument "that the July 2011 demand letter unlawfully creates a national firearms registry." *Ibid.*; *see* Peterson Br. 28-30, 36-40. "A national firearms registry is a large-scale collection of records . . . [b]ut the July 2011 demand letter reaches only (1) FFLs in four states; (2) who are licensed dealers and pawnbrokers; (3) and who sell two or more rifles of a specific type; (4) to the same person; (5) in a five-business-day period." *NSSF*, 2013 WL 2360953, at *10. Unlike the demand letter upheld by the Fourth Circuit in *RSM,* which required licensees "to report information on 'firearms purchases and sales for the past three years, and on a monthly basis thereafter,' the July 2011 demand letter requires the reporting of only a limited number of sales and only on a prospective basis." *Ibid.* (quoting *RSM,* 254 F.3d at 63). "In short, because ATF sent the demand

---

[10] Plaintiffs' contention (Peterson Br. 37, 39-40) that the appropriations provision forbids "*any* consolidation or centralization of record information" by ATF regardless of scope, and that the involvement of ATF's National Tracing Center in "processing the reports violates the proviso" cannot be squared with the D.C. Circuit's decision that the appropriations rider does not prohibit the same demand letter challenged in this case, *NSSF,* 2013 WL 2360953, at *10, or the decisions of the Fourth and Ninth Circuits holding "that the annual appropriations riders [did] not prohibit the Bureau from issuing the demand letter in [those] case[s]," *Blaustein & Reich,* 365 F.3d at 288; *J&G Sales,* 473 F.3d at 1049; *RSM,* 254 F.3d at 67-68. *See also NSSF,* 2013 WL 2360953, at *10 n.11.

letter to only seven percent of FFLs nationwide and required information on only a small number of transactions, the July 2011 demand letter does not come close to creating a 'national firearms registry.'" *Ibid.*

## II.   ATF's Decision To Issue The Letters To A Certain Class Of Dealers Was Not Arbitrary Or Capricious.

**A.** "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). Under that "very deferential" standard, "[a] presumption of validity attaches to the agency action and the burden of proof rests with the parties who challenge such action." *Hillsdale Environmental Loss Prevention*, 702 F.3d at 1165 (quotation marks omitted). A reviewing court must uphold an agency's actions if the record shows "a rational connection between the facts and the decision made." *MacKay v. Drug Enforcement Administration*, 664 F.3d 808, 817 (10th Cir. 2011) (quotation marks omitted); *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (reviewing court must uphold even "'a decision of less than ideal clarity if the agency's path may reasonably be discerned'").

When it comes to particular line-drawing decisions, "[a]n agency has discretion to choose a methodology, so long as it explains why it is reliable." *Hillsdale Environmental Loss Prevention*, 702 F.3d at 1178. "'[T]he relevant question is whether

40

the agency's numbers are within a zone of reasonableness.'" *NSSF*, 2013 WL 2360953, at *11 (quoting *WorldCom, Inc. v. FCC*, 238 F.3d 449, 462 (D.C. Cir. 2001)). The agency "'is not required to identify the optimal threshold with pinpoint precision. It is only required to identify the standard and explain its relationship to the underlying regulatory concerns.'" *Ibid.* (quoting *WorldCom, Inc.*, 238 F.3d at 461-62). Thus, "[w]here the agency's line-drawing does not appear irrational and [Plaintiff] has not shown that the consequences of the line-drawing are in any respect dire" courts "will leave that line-drawing to the agency's discretion." *Leather Indus. of Am., Inc. v. EPA*, 40 F.3d 392, 409 (D.C. Cir. 1994).

Plaintiffs here repeat arguments considered and rejected by the D.C. Circuit when they contend (Rutherford Br. 30) that ATF's decision to issue the letter to licensed dealers and pawnbrokers in the southwest border States was unreasonable in light of "the option to direct the demand letter to just those specifically-identified retail sellers who, by virtue of their proximity to the border with Mexico, the size and nature of their inventories or other reasons, were shown to have sold firearms that were recovered in Mexico." As the D.C. Circuit explained, "ATF's line-drawing plainly satisfies the standard because the problem ATF sought to address is most severe in Arizona, California, New Mexico and Texas." *NSSF*, 2013 WL 2360953, at *11.

ATF trace data indicates that "'the top four source locations by state for all firearms recovered in Mexico that were submitted for tracing and successfully traced to non-licensed purchasers between December 1, 2006 and August 31, 2010, were Texas, Arizona, California and New Mexico.'" *Ibid.*; *see also* Appx 254-55, 473, 656, 740.  The administrative record reveals that "[f]rom fiscal year 2004 to fiscal year 2008, most of the firearms seized in Mexico and traced came from U.S. Southwest border states.  In particular, about 70 percent of these firearms came from Texas, California, and Arizona."  Appx 655.  Between fiscal year 2008 and 2010, 5,799 long guns greater than .22 caliber were traced from Mexico to a first retail buyer in the United States; 4,568 of these came from the U.S./Mexico border states of Texas, Arizona, California, and New Mexico.  Appx 254 (Spreadsheet of Traces to Retail Dealer and Purchaser Identified FY 2008 – FY 2010).

ATF thus "focus[ed] [its] limited industry operations resources on and near the border region," Appx 615, seeking "multiple sale reports on the specific types of long guns used by Drug Trafficking Organizations in Mexico and along the southwest border," Appx 819-20.  In the supporting statement for its notice of information collection, ATF explained that "[a]s part of the Southwest Border Firearms Trafficking/Violence Initiative, ATF is requiring licensed dealers and pawnbrokers in California, Texas, Arizona, and New Mexico to submit information concerning multiple sales of certain rifles."  Appx 761, 817.  "The goal," ATF explained, "is to

42

detect and disrupt firearms trafficking before the firearms are used in violent crime, whether in the United States or in Mexico." Appx 763.

In light of the record evidence supporting the agency's articulated "connection between the facts and the decision made," *MacKay*, 664 F.3d at 817 (quotation marks omitted), the agency's line-drawing is entirely reasonable. There is no merit to the argument (Rutherford Br. 30) that ATF's focus on the top four source-States for firearms recovered in Mexico and successfully traced to non-licensed purchasers is somehow rendered unreasonable by "the option to direct the demand letter to just those specifically-identified retail sellers who, by virtue of their proximity to the border with Mexico, the size and nature of their inventories or other reasons, were shown to have sold firearms that were recovered in Mexico."

An agency "must consider only 'significant and viable' and 'obvious' alternatives," and "need not consider every alternative proposed nor respond to every comment made." *NSSF*, 2013 WL 2360953, at *12. As the administrative record reveals, plaintiffs' alternative targeting strategy "was not a significant problem raised by the comments." *Ibid* (quotation marks and brackets omitted). Indeed, plaintiffs rely (Rutherford Br. 11) "on only one source from the administrative record: an August 2009 pamphlet authored by 'Mayors Against Illegal Guns,' which makes forty separate general recommendations on a wide variety of topics with the goal of 'enhancing enforcement' of firearms laws," *NSSF*, 2013 WL 2360953, at *12 (brackets

43

omitted).  "The pamphlet did not address the proposed demand letter nor did it address the targeting strategy [plaintiffs] propose[] here."  *Ibid.*

In any event, the administrative record belies plaintiffs' suggestion (Rutherford Br. 30) that their proposal "would have enabled ATF to accomplish its objective more rationally and directly."  As one commenter noted to the agency, traffickers can easily vary the specific dealers from whom they purchase firearms in order to avoid detection by ATF.  Appx 804.  Thus, as the district court correctly observed (Appx 77), Plaintiffs' purportedly "rational" alternative (Rutherford Br. 30) would require ATF to constantly adjust the specific licensees subject to the reporting requirement, undermining its administrability.[11]

In addition, although ATF trace data is useful in establishing broad patterns of behavior by firearms traffickers, such data cannot conclusively establish that a

---

[11] The reasonableness of ATF's decision to collect information based on state boundaries — rather than on "alternatives to the state boundary parameter[] such as actual geographic proximity of retail sellers to the border with Mexico" (Rutherford Br. 7) — is underscored by the centrality of these boundaries to the regulation of firearms sales. For example, the Gun Control Act provides that federal firearms licensees may "conduct business temporarily at [certain] location[s] other than the location specified on the license" if "such location is in the State which is specified on the license."  18 U.S.C. § 923(j); *see also* H.R. Rep. No. 90-1577, at 6 (1968) (the "principal purpose" of the Gun Control Act was "to assist the States effectively to regulate firearms traffic within their borders"); S. Rep. No. 89-1866, at 5 (1966) (noting, with respect to handguns, that "the lawmakers of each State are best able to determine the conditions and needs within their own borders and to pass appropriate legislation").

particular federal firearms licensee has *not* sold any rifles that were later trafficked to Mexico, because it "only represents data from gun trace requests submitted from seizures in Mexico and not all the guns seized." Appx 652; *see also* Appx 58; *NSSF*, 2013 WL 2360953, at \*11. A reporting requirement limited only to licensees shown to have sold trafficked firearms, moreover, would less effectively serve the agency's objective of disrupting the illicit movement of firearms along the southwest border *before* they are trafficked into Mexico. *See, e.g.*, Appx 476, 613, 639.

Plaintiffs (Rutherford Br. 32-34) cite a number of inapposite cases in an unsuccessful attempt to shift the standard for this court's review of ATF's decisionmaking process. As plaintiffs acknowledge (Rutherford Br. 32-34), these cases, unlike ATF's action here, involve agency decisions to rescind a longstanding regulation or policy in lieu of adopting a more narrowly-tailored revision to the policy—that is, "'a reversal of the agency's former views as to the proper course,'" *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 812 (D.C. Cir. 1983).[12] *See also NSSF*, 2013 WL 2360953, at \*13.

---

[12] *See also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 46 (National Highway Traffic Safety Administration's rescission of a passive restraint requirement was arbitrary and capricious because the agency apparently gave no consideration to requiring that airbag technology be utilized rather than rescinding the passive restraint standard altogether); *American Bankers Association v. National Credit Union Administration*, 05-CV-2247, 2008 WL 2857678, \*10 (M.D. Pa. July 21, 2008) (rejecting the agency's analysis because the agency "failed to provide an explanation for changing its course" and "failed to provide an explanation for discrediting evidence contrary to its finding").

Here, ATF has consistently maintained that multiple sales information is important to the agency's efforts "to detect, investigate and prevent firearms trafficking" and that multiple sales reports "provide ATF with potential intelligence and almost real-time investigative leads that can indicate illegal firearms trafficking." Appx 817. ATF relied on longstanding experience showing that licensee reporting of multiple sales of firearms to a single unlicensed person "helps expedite the time required by ATF to complete a crime gun trace," Appx 664, and that "the tracing of firearms" is an "essential component" of ATF's efforts to "reconstruct the flow of weapons" — including firearms trafficking "along the border, how and where they are being purchased, and who is purchasing them." Appx 614. As the D.C. Circuit explained, the Bureau had before it evidence that semi-automatic rifles of a certain kind and capability were being used by members of Mexican drug gangs, and that many of these rifles were purchased from licensed firearms dealers in the border States of Texas, Arizona, California, and New Mexico. *NSSF*, 2013 WL 2360953, at *3, 11. ATF's decision to focus the demand letter's reporting requirements on licensees in states bordering Mexico was "a rational conclusion" in light of these facts. Appx 77. As the district court observed, "[s]imply because ATF could have limited its request to a different set of FFLs does not make its decision arbitrary or capricious" when the record reflects "that ATF articulated a rational connection between the facts found and the decision made." *Ibid.*

46

**B.** There is no merit to plaintiff Peterson's argument (Peterson Br. 1, 8, 46) that the district court should have excluded "[t]he portions of the administrative record concerning Mexican firearms traces."[13]  As this Court has explained, review of agency action under the Administrative Procedure Act "is generally based on the full administrative record that was before all decision makers," *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)), which "consists of all documents and materials directly or indirectly considered by the agency," *ibid*.  The district court correctly noted these points when denying Peterson's motion to exclude.  *See* Appx 54.

Peterson does not dispute that he seeks to exclude trace results that were part of the "documents and materials directly or indirectly considered by the agency," *Bar MK Ranches,* 994 F.2d at 739.  Rather, Peterson contends (Br. 46-55) that exclusion is appropriate because the funding, development, and implementation of ATF's system for tracing firearms recovered in Mexico are contrary to law and the intentions of Congress.  That argument lacks merit.

Peterson is incorrect in asserting (Br. 50) that 18 U.S.C. § 923(g)(7) limits ATF's tracing authority to traces of a firearm involved in "a *domestic* 'bona fide

---

[13] The other plaintiffs in this action sought an order requiring ATF to produce this data in unredacted form.  *See* Order of August 2, 2012 (denying Rutherford plaintiffs' motion to supplement the administrative record), Docket Entry 71, Case Nos. 11-CV-678, 12-CV-167 (D.N.M).

criminal investigation.'" By its plain language, that provision "merely requires an FFL, when the Bureau makes a request in connection with the disposition of a firearm in the course of a criminal investigation, to produce record information within twenty-four hours." *Blaustein & Reich*, 365 F.3d at 287 n.13. "[S]ection 923(g)(7)'s specific trace request requirements do not purport to bear on section 923(g)(5)(A)'s demand letter requirements." *NSSF*, 2013 WL 2360953, at *8

Congress is aware that ATF conducts traces requested by law enforcement officials in other nations and in past years has specifically appropriated funds for this very purpose. In 2012, the Senate Committee on Appropriations instructed ATF to "provide the Committee with annual data on the *total number of firearms recovered by the Government of Mexico*, and of those, the *number for which an ATF trace is attempted*, the number successfully traced and the number determined to be manufactured in or imported into the United States prior to being recovered in Mexico." S. Rep. No. 112-158, at 63 (2012) (emphasis added). In 2004, the House Committee on Appropriations directed ATF to increase funding for the National Tracing Center Division by $1 million, noting that "[t]he Committee understands that the number of trace requests, *particularly international trace requests*, is growing dramatically." H.R. Rep. No. 108-576, at 29 (2004) (emphasis added).

Peterson's remaining arguments for excluding these important components of the administrative record are similarly without merit. His assertion (Peterson Br. 53)

that "[d]isclosure of information concerning firearm purchasers to Mexican authorities is barred by § 552a(b) of the Privacy Act" is a non-sequitur because the documents in question were generated from information provided by Mexican authorities to ATF, not from any system of records of a federal agency to which the Privacy Act would apply.  *See* 5 U.S.C. § 552a(a)(5), (b).  In any event, ATF has properly provided that "[r]ecords compiled and maintained by the Bureau" as part of its Criminal Investigation Report System "may be disclosed as a routine use . . . [t]o appropriate federal, state, local, *foreign*, or tribal law enforcement authorities for law enforcement purposes — criminal, civil, or regulatory."  Notice Publishing ATF Privacy Act Systems of Records, 68 Fed. Reg. 3,551, 3,553-54 (Jan. 24, 2003); *see also* 5 U.S.C. § 552a(a)(7), (b)(3), (e)(4)(D).[14]

---

[14] Peterson did not properly raise in district court his current claim (Br. 52) that the administrative record does not contain documents establishing that the funding of ATF system for tracing firearms recovered in Mexico "complied with [31 U.S.C.] § 9703(g)(4)(C)," a statutory provision stating that "[a]ny obligation or expenditure" from the Department of Treasury's forfeiture fund "in excess of $500,000 . . . may not be made by the Secretary unless the Appropriations Committees of both Houses of Congress are notified at least 15 days in advance of such obligation or expenditure." *See, e.g.*, *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) ("The general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief." (quotation marks and brackets omitted)); *see also Garcia v. Int'l Elevator Co., Inc.*, 358 F.3d 777 (10th Cir. 2004) (discussing waiver of argument raised for the first time in a district court reply brief).  In any event, this argument fails on the merits. "[A] presumption of regularity attaches to the actions of Government agencies," *U.S. Postal Service v. Gregory*, 534 U.S. 1, 10 (2001), and "'in the absence of clear evidence to the contrary, courts presume that [public officers] have properly discharged their

49

**CONCLUSION**

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

STUART F. DELERY
   *Acting Assistant Attorney General*

KENNETH J. GONZALES
   *United States Attorney*

MICHAEL S. RAAB
   (202)-514-4053

ANISHA S. DASGUPTA /S/
   (202) 514-5428
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7237*
   *U.S. Department of Justice*
   *950 Pennsylvania Ave., N.W.*
   *Washington, D.C.  20530*

July 8, 2013

---

official duties,'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)).

## STATEMENT REGARDING ORAL ARGUMENT

Because of the importance of the issues involved, oral argument may assist the Court in resolving the dispute in this case.

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND
TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation in Federal Rule of
Appellate Procedure 32(a)(7)(B) because this brief contains 12,262 words, excluding
the parts of the brief exempted by Federal Rule of Appellate Procedure
32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of
Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of
Appellate Procedure 32(a)(6) because this brief has been prepared using 14-point
Garamond font.

<u>s/ Anisha S. Dasgupta</u>
Anisha S. Dasgupta
Attorney for Defendant-Appellee

## CERTIFICATE OF DIGITAL SUBMISSION

Pursuant to Circuit Rule 25.5, I hereby certify that:

1.    all required privacy redactions have been made and, with the exception

      of those redactions every document submitted in Digital Form or

      scanned PDF format is an exact copy of the written document filed with

      the Clerk; and

2.    the digital submissions have been scanned for viruses with the most

      recent version of the following commercial virus scanning program,

      which indicates that the submissions are free of viruses.

      Program:     Microsoft Forefront Endpoint Protection

      Version:     1.153.1481.0

      Last Updated:     July 8, 2013

                  s/ Anisha S. Dasgupta
                  Anisha S. Dasgupta
                  Attorney for Defendant-Appellee

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2013, I electronically filed the foregoing

brief with the Clerk of the Court via the CM/ECF system, which will send notice of

such filing to the following registered CM/ECF users:

Richard Gardiner, Stephen P. Halbrook
392 Chain Bridge Road, Suite 403
Fairfax, VA 22030
*Counsel for Plaintiff-Appellant Ron Peterson*

James B. Vogts, Andrew A. Lothson
Swanson, Martin & Bell, LLP
330 N. Wabash, Suite 3300
Chicago, IL 60611
*Counsel for Plaintiffs-Appellants*
*Dale Rutherford d/b/a The Cop Shop*
*Tracy Rifle and Pistol Inc.*


 s/ Anisha S. Dasgupta
Anisha S. Dasgupta
Attorney for Defendant-Appellee

ADDENDUM

## ADDENDUM CONTENTS

18 U.S.C. § 923(g)(1)(A), (B) ............................................................................A1

18 U.S.C. § 923(g)(3)(A) ...................................................................................A2

18 U.S.C. § 923(g)(5)(A) ...................................................................................A2

18 U.S.C. § 923(g)(7) ........................................................................................A2

18 U.S.C. § 926(a) .............................................................................................A3

## 18 U.S.C. § 923(g)(1)

**(A)** Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Attorney General may by regulations prescribe. Such importers, manufacturers, and dealers shall not be required to submit to the Attorney General reports and information with respect to such records and the contents thereof, except as expressly required by this section. The Attorney General, when he has reasonable cause to believe a violation of this chapter has occurred and that evidence thereof may be found on such premises, may, upon demonstrating such cause before a Federal magistrate judge and securing from such magistrate judge a warrant authorizing entry, enter during business hours the premises (including places of storage) of any licensed firearms importer, licensed manufacturer, licensed dealer, licensed collector, or any licensed importer or manufacturer of ammunition, for the purpose of inspecting or examining--

**(i)** any records or documents required to be kept by such licensed importer, licensed manufacturer, licensed dealer, or licensed collector under this chapter or rules or regulations under this chapter, and

**(ii)** any firearms or ammunition kept or stored by such licensed importer, licensed manufacturer, licensed dealer, or licensed collector, at such premises.

**(B)** The Attorney General may inspect or examine the inventory and records of a licensed importer, licensed manufacturer, or licensed dealer without such reasonable cause or warrant--

**(i)** in the course of a reasonable inquiry during the course of a criminal investigation of a person or persons other than the licensee;

**(ii)** for ensuring compliance with the record keeping requirements of this chapter--

**(I)** not more than once during any 12-month period; or

**(II)** at any time with respect to records relating to a firearm involved in a criminal investigation that is traced to the licensee; or

**(iii)** when such inspection or examination may be required for determining the disposition of one or more particular firearms in the course of a bona fide criminal investigation.

\* \* \* \*

## 18 U.S.C. § 923(g)(3)(A)

Each licensee shall prepare a report of multiple sales or other dispositions whenever the licensee sells or otherwise disposes of, at one time or during any five consecutive business days, two or more pistols, or revolvers, or any combination of pistols and revolvers totalling two or more, to an unlicensed person. The report shall be prepared on a form specified by the Attorney General and forwarded to the office specified thereon and to the department of State police or State law enforcement agency of the State or local law enforcement agency of the local jurisdiction in which the sale or other disposition took place, not later than the close of business on the day that the multiple sale or other disposition occurs.

## 18 U.S.C. § 923(g)(5)(A)

Each licensee shall, when required by letter issued by the Attorney General, and until notified to the contrary in writing by the Attorney General, submit on a form specified by the Attorney General, for periods and at the times specified in such letter, all record information required to be kept by this chapter or such lesser record information as the Attorney General in such letter may specify.

## 18 U.S.C. § 923(g)(7)

Each licensee shall respond immediately to, and in no event later than 24 hours after the receipt of, a request by the Attorney General for information contained in the records required to be kept by this chapter as may be required for determining the disposition of 1 or more firearms in the course of a bona fide criminal investigation. The requested information shall be provided orally or in writing, as the Attorney General may require. The Attorney General shall implement a system whereby the licensee can positively identify and establish that an individual requesting information via telephone is employed by and authorized by the agency to request such information.

**18 U.S.C. § 926(a)**

**(a)** The Attorney General may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter,

\* \* \* \*

No such rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established. Nothing in this section expands or restricts the Secretary's authority to inquire into the disposition of any firearm in the course of a criminal investigation.