NOS. 13-2054 and 13-2055

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

**RON PETERSON FIREARMS, LLC; DALE RUTHERFORD, doing business as THE COP SHOP, and TRACY RIFLE and PISTOL, INC.**

Plaintiffs-Appellants,

v.

**B. TODD JONES, ACTING DIRECTOR, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, in his official capacity,**

Defendant-Appellee.

_____

**On Appeal from Judgment Entered in the
United States District Court for the District of New Mexico
Civil Action No. 11-678 (consolidated with 12-167) (Judge Judith C. Herrera)**

_____

**REPLY BRIEF OF APPELLANTS RON PETERSON FIREARMS, LLC, DALE RUTHERFORD, doing business as THE COP SHOP, and TRACY RIFLE & PISTOL, INC.**

_____

Stephen P. Halbrook
Law Office of Stephen P. Halbrook
3925 Chain Bridge Road, Suite 403
Fairfax, VA  22030
(703) 352-7276

*Counsel for Ron Peterson Firearms, LLC*

James B. Vogts
Swanson, Martin & Bell, LLP
330 N. Wabash, Suite 3300
Chicago, IL 60611
(312) 222-8517

*Counsel for Dale Rutherford
d/b/a The Cop Shop and Tracy
Rifle & Pistol, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

ABBREVIATIONS ................................................................................ vi

ARGUMENT ..........................................................................................1

  I.  THE DEMAND LETTER IS NOT AUTHORIZED BY § 923(G)(5)(A)
     AND CONFLICTS WITH OTHER PROVISIONS OF LAW ...................1

    A. The Demanded Information Is Not "Record Information Required to
       Be Kept by this Chapter," And Is Thus Not Authorized by §
       923(g)(5)(A) .......................................................................................1

    B.  The Reporting Timeframe Requires Creation of Records Inconsistent
       With How Forms 4473 Are Kept..........................................................8

    C.  The Demand-letter Authority must Be Read in Harmony with
       Congress' Intent Expressed in the Other Provisions of § 923 and in §
       926(a) ...............................................................................................10

       1.  The Prohibition on Requiring Reports Is
          Not Expressly Required ...............................................................10

       2.  By Providing for Multiple Handgun Sale Reports, Congress
          Excluded Multiple Sale Reports for Other Firearms....................11

       3   By Limiting Trace Requests to Bona Fide Criminal
          Investigations, Congress Excluded Traces for Other Purposes....12

       4.  The Demand Letter Circumvents § 926(a) ...................................14

    D. The Legislative History Reconciles Differing Provisions
       and Confirms the Understandings of Both Congress and ATF ..........16

    E.  The Demand Letter Results in a Consolidation or Centralization of a
       Portion of the Records of Acquisition and Disposition of Firearms...18

  II.  ISSUANCE OF THE DEMAND LETTER WAS ARBITRARY AND
     CAPRICIOUS ............................................................................................20

ii

A. ATF's Failure to Explain Its Rejection of Known and Obvious Alternatives to Its Decision to Send the Demand Letter to Every Retail Seller in the Four Border States Renders Its Action Arbitrary and Capricious .......................................................................20

B. Portions Of The Administrative Record Should Have Been Excluded ...........................................................26

CONCLUSION .......................................................................30

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*10 Ring Precision, Inc. v. Jones*, No. 12–50742,
   2013 WL 3480202 (5th Cir. July 11, 2013) .......................................... passim

*Action on Smoking and Health v. C.A.B.*, 699 F.2d 1209 (1983) ............................26

*Alaska Professional Hunters Ass'n v. FAA*, 177 F.3d 1030 (D.C. Cir. 1999).........15

*Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281 (4th Cir. 2004) .....................7, 20

*Borchardt Rifle Corp. v. Cook*, 684 F.3d 1037 (10th Cir. 2012)..............................2

*Chemehuevi Tribe of Indians v. FPC*, 420 U.S. 395 (1975).......................................1

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971) ........................22

*City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153 (D.C. Cir. 1987).............23

*Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628 (3d Cir. 1989) .............................5

*Heckler v. Community Health Services of Crawford County, Inc.*,
   467 U.S. 51 (1984).........................................................................................18

*International Ladies Garment Worker's Union v. Donovan*,
   722 F.2d 795 (D.C. Cir. 1983)......................................................................26

*J&G Sales Ltd.* v. *Truscott*, 473 F.3d 1043 (9th Cir. 2007) ...............................7, 12

*MG Altus Apache Co. v. United States*, 102 Fed. Cl. 744 (Fed. Cl. 2012)..............25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).........................................................................................26

*Nat'l Shooting Sports Foundation, Inc. v. Jones*,
   716 F.3d 200 (D.C. Cir. 2013)................................................................ passim

*National Rifle Ass'n v. Brady*, 914 F.2d 475 (4th Cir. 1990)....................................1

*Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987)...............................12

*Perrin v. United States*, 444 U.S. 37 (1979) ..........................................................20

*Rice v. Rehner*, 463 U.S. 713 (1983) ....................................................17

*RSM, Inc. v. Buckles*, 254 F.3d 61 (4th Cir. 2001) ......................... passim

*Russello v. United States*, 464 U.S. 16 (1983)..........................................11

*Small v. United States*, 544 U.S. 385 (2005) ......................................27

*Telocator Network of America v. FCC*, 691 F.2d 525 (D.C. Cir. 1982) ...............22

*U.S. Postal Serv. v. Gregory*, 534 U.S. 1 (2001) ...................................29

*United States ex rel. Holmes v. Consumer Ins. Group*,
    318 F.3d 1199 (10th Cir. 2003) ....................................................1

*United States v. Chemical Foundation,* 272 U.S. 1 (1926) ....................................29

*United States v. Davey*, 543 F.2d 996 (2d Cir. 1976)................................5

*United States v. Doe*, 465 U.S. 605 (1984)............................................5

*United States v. Magnesium Corp. of America*, 616 F.3d 1129 (10th Cir. 2010) ...15

<u>Statutes</u>

5 U.S.C. § 552(a)(5)....................................................................28

5 U.S.C. § 552a(a)(7) ...................................................................28

18 U.S.C. § 921(a)(3), (5), & (7) ...................................................3

18 U.S.C. § 923(g) ..................................................................... 11, 12

18 U.S.C. § 923(g)(1)(A) ....................................................... 1, 8, 10, 11, 13

18 U.S.C. § 923(g)(1)(B)(iii) ..................................................... 12, 13, 14

18 U.S.C. § 923(g)(3)(A) ...........................................................11

18 U.S.C. § 923(g)(5)................................................................ passim

18 U.S.C. § 923(g)(5)(A) ............................................................ passim

18 U.S.C. § 923(g)(7)........................................................................ 12, 13, 14, 27

18 U.S.C. § 926(a) .......................................................................... 13, 14, 16

26 U.S.C. § 7602 ....................................................................................5

31 U.S.C. § 9703(g)(4)(C) ...................................................................28

Consolidated & Further Continuing Appropriations Act, 2012,
Tit. II, Pub.L. 112-55, 125 Stat. 552, 609 (2011) ...................................18

P.L. 95-429, 92 Stat. 1001 (1978)..........................................................19

P.L. 103-123, 107 Stat. 1229 (1993).......................................................19

Ca. Penal Code §27535(b)(8) ................................................................10

Ca. Penal Code § 28050 ........................................................................10

## Regulations

27 C.F.R. § 478.11 ..................................................................................3

27 C.F.R. § 478.124 ................................................................................2

27 C.F.R. § 478.124(b) ...........................................................................8

27 C.F.R. § 478.124(c)(4) ....................................................................2, 3

27 C.F.R. § 478.125(e)..........................................................................2, 9

27 C.F.R. § 478.126(a)..........................................................................15

27 C.F.R. § 478.92(a)(1)(ii)(A) ..............................................................4

## Other Authorities

132 Cong. Rec. S5351 (May 6, 1986) ....................................................17

33 Fed. Reg. 18,555 (Dec. 14, 1968) .....................................................16

43 Fed. Reg. 11,800 (Mar. 21, 1978)........................................................................19

Letter of Harold Serr, Director, Alcohol & Tobacco Tax Division,
    to Senator Frank Church, Dec. 17, 1968,
    in 131 Cong. Rec. S9129 (July 9, 1985)..........................................................17

S.Rep. 98-583, 98th Cong., 2d Sess. (1984) ................................................. 13, 17, 19

*Webster's New World Dictionary*, *College Edition* (1968) .....................................20

## ABBREVIATIONS

Brief.........................................................................................................................Br.

Bureau of Alcohol, Tobacco, Firearms and Explosives ......................................ATF

Federal Firearms Licensee ...................................................................................FFL

Firearms Owners' Protection Act ....................................................................FOPA

Gun Control Act....................................................................................................GCA

## ARGUMENT

The sole issue in this case is whether ATF is authorized by law to require federal firearm licensees (FFLs) to report certain information to ATF. However, much of Jones' brief consists of policy arguments about using such reports as a means of addressing crime in Mexico. *E.g*., Jones Brief ("Br.") at 10-19.

Policy arguments are "properly addressed to Congress, not to the courts." *Chemehuevi Tribe of Indians v. FPC,* 420 U.S. 395, 423 (1975). *See United States ex rel. Holmes v. Consumer Ins. Group*, 318 F.3d 1199, 1214 (10th Cir. 2003) ("we reject the government's public policy arguments . . . . [T]hat is Congress' prerogative, not ours.").[1]

## I. THE DEMAND LETTER IS NOT AUTHORIZED BY § 923(g)(5)(A) AND CONFLICTS WITH OTHER PROVISIONS OF LAW.

### A. The Demanded Information Is Not "Record Information Required to Be Kept by this Chapter," And Is Thus Not Authorized by § 923(g)(5)(A).

ATF's authority to issue a demand letter is limited to "record information required to be kept by this chapter [Chapter 44]." 18 U.S.C. § 923(g)(5)(A). That includes records of sales of firearms as prescribed by regulations. § 923(g)(1)(A).

---

[1] "The policy arguments forwarded by the Secretary with respect to enforcement 'should be directed to the Congress rather than to [the courts].'" *National Rifle Ass'n v. Brady,* 914 F.2d 475, 485 (4th Cir. 1990) (citation omitted) (invalidating ATF recordkeeping regulation).

Those records are specified in 27 C.F.R. § 478.124 and § 478.125(e), about which Jones states:

> The demand letter requires licensees . . . to submit a subset of this record information when within a five-day period a licensee sells to the same person two or more long guns that are "semi-automatic" and "capable of accepting a detachable magazine" "with a caliber greater than .22 (including .223/5.56 caliber)," Appx 80.

Br. at 30.

However, information about the design of the action (such as semi-automatic), or whether a firearm accepts a detachable magazine, is not found in the record information required by the regulations.

Jones avers: "All of the information requested by the demand letter appears on the Form 4473 that licensees are already required to maintain." Br. at 30. But he well knows that the only information describing the firearm on the Form 4473 is the "'[t]ype of firearm(s) to be transferred' – 'Handgun,' 'Long Gun (*rifles or shotguns*),' or 'Other Firearm (*Frame, Receiver, etc. . . .*)' – and the firearm's manufacturer, importer, type, model, gauge or caliber, and serial number." Br. at 29-30, quoting 27 C.F.R. § 478.124(c)(4).[2]

---

[2] *See Borchardt Rifle Corp. v. Cook*, 684 F.3d 1037, 1039 (10th Cir. 2012) (noting that the same information is also required to be kept in the FFL's book of acquisitions and disposition, 27 C.F.R. § 478.125(e)). That case affirmed ATF's revocation of a license for willful violation of the regulations requiring the specified records. Obviously, a license could not be revoked for failure to

The Form 4473 thus requires the caliber, but is silent on the action design and the magazine type, if any. Jones responds that the letter demands information "about a specific subset of firearms," and it does not matter that "the specific criteria defining the subset" is information not required to be kept. Br. at 30-31. But such semantics fail to obscure that the "record information" required by the regulations includes no such "subset."

There are "subsets" that are actually named in the statute and regulations. For instance, the term "firearm" includes the subsets "rifle," "shotgun," "pistol," revolver," and "frame or receiver."[3] These are firearm "types" that are required to be recorded.[4] But the alleged "subset" here is not information required to be kept in the records.

The D.C. and Fifth Circuits recently upheld the demand letter, but their reasoning actually clarifies further that the demanded information is *not* required record information. The D.C. Circuit asked "why an FFL cannot determine a rifle's type of action and ammunition feeding source using his record of the rifle's serial number, manufacturer and/or model name." *Nat'l Shooting Sports Foundation, Inc. v. Jones*, 716 F.3d 200, 209 (D.C. Cir. 2013) ("*NSSF*") (adding,

---

record the action design and magazine type, if any, since that information is not required to be recorded.

[3]  18 U.S.C. § 921(a)(3), (5), & (7); 27 C.F.R. § 478.11 ("pistol," "revolver").

[4]  27 C.F.R. § 478.124(c)(4).

"To argue . . . that an FFL – who purchases and sells firearms for a living – would price and sell rifles without knowing its type of action and ammunition feeding source blinks reality.").[5]

Yet *NSSF* conceded that there was nothing in the record about whether an FFL would or would not know such facts.[6]  *Id*. at 209 & n.10.  A serial number is just a number, and manufacturers typically make numerous designs.  A "model" must be recorded only "if such designation has been made."  27 C.F.R. § 478.92(a)(1)(ii)(A).[7]  But even if the rifle has a model name, the required record information includes nothing about the rifle's design, other than its caliber.

Moreover, the above confuses what an FFL might "determine" or "know" with the entirely different category of "record information required to be kept,"

---

[5]  The Fifth Circuit repeats these words without further analysis.  *10 Ring Precision, Inc. v. Jones*, No. 12–50742, 2013 WL 3480202, *4 (5th Cir. July 11, 2013).

[6]  That is the consequence of ATF having created the administrative record and of the caselaw limiting judicial review to the administrative record.

[7]  The D.C. Circuit stated: "NSSF does not show that an FFL could not determine the type of action or ammunition feeding source of a rifle lacking a model name from the manufacturer information the FFL does possess."  *Id*. at 210.   That turns the normal rule for establishment of facts upside down.  Jones presented no evidence that an FFL could so determine.

§ 923(g)(5). Such "record information" includes "the model," but not the design characteristics of a model, or whatever else an FFL may "know."[8]

A fundamental distinction exists between what a person may know or be able to learn, and the records required to be kept. "The statutes and regulations do not require disclosure of all information within the knowledge of defendants." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 640 (3d Cir. 1989) (SEC reports). Tax returns and W-2 statements are not the same as information known to a taxpayer but not required to be kept or reported to the IRS. *United States v. Doe*, 465 U.S. 605, 607 (1984). "We therefore understand that this case concerns only business documents and records not required by law to be kept or disclosed to a public agency." *Id*. at 607 n.3.[9]

*NSSF* makes the distinction between required record information and what an FFL may or may not know, but which is not required record information, even clearer when it states:

> And even assuming an FFL could somehow not
> determine the characteristics of his own rifles, ATF
> provides a web site and telephone number that the FFL

---

[8] Consider a demand letter requiring FFLs to report rifles that are green, which can be easily seen. That does not mean that the color of a rifle is "record information required to be kept," or that requiring reports of green rifles would only be a "subset" of information from required records.

[9] *See United States v. Davey*, 543 F.2d 996, 1000 (2d Cir. 1976) (26 U.S.C. § 7602 "cannot be used to compel a taxpayer to make the Service's auditing tasks easier, such as by preparing or creating documents not in existence").

> can use to obtain assistance in determining whether a rifle is "semi-automatic" and "capable of accepting a detachable magazine." See Bureau of Alcohol, Tobacco, Firearms and Explosives, Q & As for the Report of Multiple Sale or Other Disposition of Certain Rifles, http:// www.atf.gov/files/firearms/industry/080911–qa–multiple–rifles .pdf. [10]

*NSSF*, 716 F.3d at *7.  *See also* Br. at 31 n.8.

But if the demand letter is only seeking "record information required to be kept," § 923(g)(5)(A), an FFL would never need to contact ATF to make the above determination.  Such information would be in the FFL's record book and Form 4473, and could simply be copied onto the ATF reporting form.

*NSSF* notes that "Form 3310.12 does not require that the FFL report the rifle's type of action or the rifle's ammunition feeding source or the number of days between sales to the same person."  *Id*. at *6; *accord*, *10 Ring Precision*, 2013 WL 3480202, at *4.  But that is precisely the information that the demand letter requires to be reported, and may as well have been explicitly printed on the Form 3310.12.   What is reported on the Form 3310.12 cannot be divorced from the demand letter.  When filing the report, the FFL is in essence saying that "these are semiautomatic rifles with detachable magazines that were sold within five business days."  But that is not "record information required to be kept," § 923(g)(5).

---

[10]  "You may contact the Firearms Technology Branch ['FTB'] at (304) 616-4300 if you are unable to determine if the rifles are subject to the reporting requirements."  Q&As, *id*.

6

*NSSF* adds that the "demand letter's conditions precedent are not being used to require additional information from FFLs, but instead limit the scope of the information demanded." *Id*. at \*6. But these "conditions precedent" defining the scope of the information demanded are not "record information required to be kept."

Jones states that Congress"gave [ATF] broad authority to seek, by demand letter, all *record information* that [federal firearms licensees] are required to maintain[.]" Br. at 25, quoting *Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 286 (4th Cir. 2004) (emphasis added). But that refers to "record information," not to  information that no regulation requires FFLs to maintain.

"While we are not free to ascribe to section 923(g)(5)(A) an open-ended reach, neither are we at liberty to eliminate altogether its positive grant of authority." *RSM, Inc. v. Buckles*, 254 F.3d 61, 67 (4th Cir. 2001); *accord*, *J&G Sales Ltd.* v. *Truscott*, 473 F.3d 1043, 1049 (9th Cir. 2007). On its face, § 923(g)(5)(A)'s positive grant of authority is limited to information from required records, and that is not what is demanded here.

In sum, ATF is attempting to impose record-keeping requirements that are not required by any regulation, despite the limitation of demand letters to "record information required to be kept," § 923(g)(5)(A), and the express mandate of §

923(g)(1)(A) that licensees maintain records only "as the Attorney General may by regulations prescribe." Accordingly, the demand letter is void.

## B. The Reporting Timeframe Requires Creation of Records Inconsistent With How Forms 4473 Are Kept.

An FFL must prepare and keep extra records not required by regulation in order to keep track of multiple sales of qualifying rifles within five business days. That information is not recorded in the Form 4473 or the record book of transactions.

First, the Form 4473 must be kept "in alphabetical (by name of purchaser), chronological (by date of disposition), or numerical (by transaction serial number) order . . . ." 27 C.F.R. § 478.124(b). If kept in alphabetical or numerical order, it could not be used to determine even whether any kind of rifle had been sold to the same person within five business days.

The D.C. Circuit suggests that the Form 4473 should be kept in chronological order, although the regulations do not so require. *NSSF*, 716 F.3d at 209; *accord*, *10 Ring Precision*, 2013 WL 3480202, at *4. But even if so kept, the forms are not required to be segmented by date of sale, *i.e.*, separating all Forms 4473 for a particular day from Forms 4473 for preceding days. Thus, regardless of which of the three methods used to keep the Forms 4473, they cannot be the basis for the information required to meet the timeline mandated by the demand letter.

To respond to that timeline, the FFL must create an additional procedure to generate records not required by a regulation.

Second, the book of transactions cannot provide the full information needed to comply with the demand letter. A firearm sale must be recorded no later than 7 days after the transaction. 27 C.F.R. § 478.125(e). The demand letter requires reports of two or more qualifying rifles within five business days, and the report must be submitted by the close of business on the day of the second sale. Additional records not required by regulation must be created to comply with this compressed schedule.

Jones acknowledges the above by asserting that "Congress did not limit ATF to requesting information only in the manner that a licensee happens to keep it." Br. at 32. To the contrary, Congress limited ATF to demanding only record information required to be kept. And an FFL who "happens to keep" Forms 4473 as required by regulation – *i.e.*, alphabetically, chronologically, or numerically – cannot be required to keep records a different way or to create new records.

While not relevant to the legal issue here, Jones states that FFLs know how to keep track because they report multiple handgun sales. Br. at 32-33; *accord*, *NSSF*, 716 F.3d at 209; *10 Ring Precision*, 2013 WL 3480202, at *4. That is not accurate about licensees who sell only long guns or who are in California, where

only one handgun may be purchased every 30 days.[11]  That other licensees may be familiar with the handgun multiple purchase form is immaterial.

Moreover, the information required to be reported for multiple handgun sales does not include the action design or magazine type, if any.  Further, unlike with the rifle-reporting demand, the five-day timeline for handgun sales is required by statute and regulation, and thus the records that need to be kept are required by law.

### C.    The Demand-letter Authority must Be Read in Harmony with Congress' Intent Expressed in the Other Provisions of § 923 and in § 926(a).

#### 1.    *The Prohibition on Requiring Reports Is Not Expressly Required.*

An FFL must maintain records of sales "as the Attorney General may by regulations prescribe," but "shall not be required to submit . . . reports and information with respect to such records and the contents thereof, except as expressly required by this section." 18 U.S.C. § 923(g)(1)(A).   It is undisputed that this "limits the Bureau's ability to procure information from FFLs to the express requirements of § 923, but it does not eviscerate the content of § 923(g)(5)(A)."

---

[11]   Jones replies that a California dealer may effectuate multiple handgun sales from a private seller to another, and thus would be familiar with the reporting procedure.  Br. at 33 n.9, citing Ca. Penal Code §§ 27535(b)(8), 28050.  But even if a dealer conducts such transactions, it would be unusual for a private party to transfer handguns through the dealer on successive days. Instead, the handguns would be transferred at the same time, in which case the dealer would not need to create extra records to identify purchasers of multiple handguns in a five day period.

Br. at 34-35, quoting *NSSF*, 716 F.3d at 211.  But § 923(g)(1)(A) is eviscerated by a demand letter requiring the reporting of information that does not constitute required records.

Just as § 923(g)(1)(A) requires the keeping of records required by regulation § 923(g)(5)(A) is limited to "record information required to be kept by this chapter . . . ."  But the demand letter here requires creation of records beyond the purview of both of these provisions.

> 2. *By Providing for Multiple Handgun Sale Reports, Congress Excluded Multiple Sale Reports for Other Firearms.*

While every other provision of § 923(g) concerns "firearms," § 923(g)(3)(A) requires an FFL to report multiple sales within five business days of "pistols and revolvers."  To claim that ATF may require for rifles by a letter what Congress has required for pistols and revolvers by statute is contrary to the canon that, where particular language is included in one section of a statute but is omitted in another section, Congress has acted "intentionally and purposely in the disparate inclusion or exclusion."  *Russello v. United States,* 464 U.S. 16, 23 (1983) (citation omitted).

*NSSF* found the canon inapplicable where there may be "other plausible explanations for an omission."  *NSSF*, 716 F.3d at 211 (citation omitted).[12]  But it would be difficult to think of a clearer instance in which "Congress knows how to authorize" something "when it wants to provide for it.  That Congress failed to do

---

[12]  *See also 10 Ring Precision*, 2013 WL 3480202, at *5.

11

so here argues forcefully that such authorization was not its intention." *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 106 (1987).

Jones argues that requirements "to provide record information sua sponte" do not negate ATF's authority to require information by demand letter. Br. at 36, quoting *J&G Sales*, 473 F.3d at 1050.[13]  By that logic, all of § 923(g) could be crossed out except for the demand-letter provision, and ATF could require anything it wished sua sponte.  That is the result of reading § 923(g)(5) in utter isolation from its neighboring provisions in which Congress took great care to define the limits of ATF's authority.

### 3. By Limiting Trace Requests to Bona Fide Criminal Investigations, Congress Excluded Traces for Other Purposes.

The same reasoning applies to Congress' particularized intent in limiting ATF's tracing authority to "bona fide criminal investigation[s]," 18 U.S.C. §§ 923(g)(1)(B)(iii), 923(g)(7).  The demand letter circumvents that by requiring licensees to provide information about multiple rifle sales without *any* criminal investigation.

Originating as a regulation in 1968, the demand-letter provision was codified in 1986 as § 923(g)(5)(A) "to clarify and ensure the Secretary's authority to conduct legitimate tracing activities in connection with bona fide criminal

---

[13]  *J&G Sales* addressed a demand letter requiring, unlike here, the reporting of required record information.

investigations." S.Rep. 98-583, 98th Cong., 2d Sess., at 18 (1984). When enacted in 1994, § 923(g)(7) for the first time required licensees to respond within 24 hours to a trace request for "a bona fide criminal investigation." Jones disregards this historical context when he asserts that "section 923(g)(7)'s specific trace request requirements do not purport to bear on section 923(g)(5)(A)'s demand letter requirements." Br. at 36.

Section 923(g)(7) is not the only provision limiting ATF access to records to criminal investigations. ATF may inspect the records with a warrant based on reasonable cause of evidence of a violation of the Gun Control Act (GCA), 18 U.S.C. § 923(g)(1)(A), and without a warrant to trace a firearm in "a bona fide criminal investigation." § 923(g)(1)(B)(iii). The prohibition on registration does not expand or restrict ATF's authority to trace a firearm in "a criminal investigation." § 926(a).

Given this consistent postulate that ATF access to records for tracing is limited to actual criminal investigations, it cannot be that the above limitations exist only to protect the FFL's privacy, and that a demand letter for records for tracing need not be limited to a criminal investigation. *See* Br. at 35. The provision requiring responses to trace requests within 24 hours refutes Jones' argument, in that it too "does not involve the entry of ATF agents onto an FFL's premises," Br. at 35 (citation omitted), yet it is restricted to bona fide criminal

investigations.  *NSSF* makes the same argument about on-premises inspections for traces, but in the very next paragraph disregards that no physical intrusion occurs when ATF requires an FFL to conduct a trace, which also requires a bona fide criminal investigation.  *NSSF*, 716 F.3d at 210-11.[14]

In sum, the provisions that authorize traces apply only in the course of a bona fide criminal investigation, and concern only specific firearms related to such investigations.  The demand letter here seeks all records of all firearms of a given type without any criminal investigation at all, to be used just in case there may be a criminal investigation in the future.  That simply renders §§ 923(g)(1)(B)(iii) and 923(g)(7) nugatory.

### 4.     *The Demand Letter Circumvents § 926(a).*

The demand letter circumvents 18 U.S.C. § 926(a), which prohibits any new rule or regulation requiring "that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to" a government facility, "nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established."

*NSSF* argues that the demand letter is not a rule or regulation and that the demand-letter provision is a statute, not a rule or regulation.  *NSSF*, 716 F.3d at 212; *see also* Br. at 38.   Actually, § 923(g)(5) is also set forth in a regulation, 27

---

[14]   The Fifth Circuit simply repeats the same arguments.  *10 Ring Precision*, 2013 WL 3480202, at *5-6.

C.F.R. § 478.126(a).  As a radical change in its interpretation of both, ATF should

have proposed its new found power in a regulation, *Alaska Professional Hunters*

*Ass'n v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999), or at least cogently explained

the legal basis for its dramatic shift, *United States v. Magnesium Corp. of America*,

616 F.3d 1129, 1144 (10th Cir. 2010) ("It is hard to see how this obligation could

be any less salient when an agency seeks to abandon a prior interpretation in favor

of a new one.").

      However, the D.C. Circuit concedes as a general matter:

> We agree with our sister circuits that the Congress
> intended to prevent ATF from "establish[ing] a national
> firearms registry" by "issu[ing] limitless demand letters
> under section 923(g)(5)(A) in a backdoor effort to avoid
> section 926(a)'s protections for law-abiding firearms
> owners."

*NSSF*, 716 F.3d at 212-13, quoting *RSM*, 254 F.3d at 67; *accord*, *10 Ring*

*Precision*, 2013 WL 3480202, at *6.

      But *RSM* upheld a demand letter to a mere 41 FFLs nationwide because they

had not complied with ATF's tracing requests.  *RSM*, 254 F.3d at 63.  No wonder

such prior cases "do not purport to establish the ceiling above which a demand

letter becomes a national firearms registry."  *NSSF*, 716 F.3d at 213.  But this

demand letter went to 8,500 FFLs.  *NSSF* concluded that since that is "only" seven

percent of FFLs nationwide, and the letter requires information "on only a small

number of transactions" – despite there being nothing in the record about the

number of multiple sales of reportable rifles – that the letter thus does not create a "national firearms registry." *NSSF*, 716 F.3d at 214.

Yet the non-statutory term "national firearms registry" does not describe the full scope of § 926(a), which prohibits requiring that "*any portion* of the contents of such [required] records" be transferred to a government facility, or establishing "*any system* of registration" of firearms disposition. (Emphasis added.)  The demand letter does both of those.

### D.  The Legislative History Reconciles Differing Provisions and Confirms the Understandings of Both Congress and ATF.

Jones liberally relies on the legislative history of the Gun Control Act of 1968 on points that are not pertinent here.  He quotes from a 1966 Senate report on legislation that was not even enacted (Br. at 44 n.11), and from Senate and House reports from 1968.  Br. at 4-5, 44 n.11.  But when it comes to clear legislative statements on the specific provisions at issue here enacted in the Firearms Owners' Protection Act of 1986 (FOPA), Jones brushes that aside as clouding a text that is supposedly clear.  Br. at 28 n.7; *accord*, *NSSF*, 716 F.3d at 211-12; *10 Ring Precision*, 2013 WL 3480202, at *5.  In fact, the legislative history clarifies the relationship between differing provisions that must be reconciled and not read in isolation.  *See* Peterson Br. at 31-36.

Jones points out that the demand-letter provision originated as a regulation in 1968.  Br. at 6-7, citing 33 Fed. Reg. 18,555, 18,571 (Dec. 14, 1968).  But he

deems it irrelevant that just three days after it was published, the ATF Director explained that it would be used "when we become aware of violations of the law by an unscrupulous dealer," and that "we have no intention of requiring law-abiding gun dealers to report their firearms transactions to us."  Letter of Harold Serr, Director, Alcohol & Tobacco Tax Division, to Senator Frank Church, Dec. 17, 1968, in 131 Cong. Rec. S9129 (July 9, 1985).[15]

Senator Orrin Hatch inserted that letter into the record to clarify the meaning of the demand-letter provision as codified in FOPA.  *Id*.  He explained: "The Senate bill explicitly codifies regulations permitting tracing of firearms used in crimes."  132 Cong. Rec. S5351 (May 6, 1986).  The provision ensured ATF's "authority to conduct legitimate tracing activities in connection with bona fide criminal investigations."  S.Rep. 98-583, at 18.

ATF administered the demand-letter provision without any apparent controversy or litigation until *RSM, Inc. v. Buckles*, 254 F.3d 61, 63 (4th Cir. 2001), which upheld a demand letter to a mere 41 FFLs nationwide.  *RSM* cautioned that "section 923(g)(5)(A) is not a limitless delegation of authority to BATF to request record information. . . . Other provisions of the statute . . . make

---

[15]  *See Rice v. Rehner*, 463 U.S. 713, 730 n.13 (1983) ("that early position . . . is surely more indicative of congressional intent" than a later "opinion to the contrary").

clear that section 923(g)(5)(A) cannot be construed in an open-ended fashion." *Id.* at 67.

Now the demand-letter authority, which the first ATF director promised would be used only in actual criminal investigations, which Congress codified in reliance on that understanding, and which the first appellate decision interpreted with great caution, has morphed into an undefined, ever-expanding power to require 8,500 FFLs nationwide to report multiple sales of qualifying rifles without any pretense of a bona fide criminal investigation. "To say to these appellants, 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government." *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 61 n.13 (1984) (citation omitted). This Court should not ignore the understanding of the provision at issue that the first ATF director confirmed and on which Congress relied when it codified that provision.

### E. The Demand Letter Results in a Consolidation or Centralization of a Portion of the Records of Acquisition and Disposition of Firearms.

ATF may not use funds for "consolidating or centralizing, within the Department of Justice, the records, or any portion thereof, of acquisition and disposition of firearms maintained by Federal firearms licensees . . . ."[16] The

---

[16] Consolidated & Further Continuing Appropriations Act, 2012, Tit. II, Pub.L. 112-55, 125 Stat. 552, 609 (2011) (referring to "funds appropriated herein or hereafter").

demand letter to 8,500 licensees requiring submission of records to ATF's National Tracing Center does just that.

*NSSF* states that Congress did not authorize the record collection in § 923(g)(5) "while simultaneously prohibiting it" in the appropriations rider. *NSSF*, 716 F.3d at 213. But that was because Congress understood that § 923(g)(5) would be used for traces in bona fide criminal investigations. S.Rep. 98-583, at 18. It did not anticipate the overly-expansive interpretation ATF would take 25 years later.

Although refusing to consider legislative history on the main provisions at issue, *NSSF* acknowledges that when it passed the first appropriations rider in 1978,[17] "Congress was alarmed by [ ]ATF's attempt to secure the records of all FFLs nationally and the accompanying invasion of lawful firearms owners' privacy." *NSSF*, 716 F.3d at 213, quoting *RSM*, 254 F.3d at 67. ATF's original proposal that the rider precluded would have required reports of firearm dispositions, but *not* the names and addresses of the purchasers. 43 F.R. 11,800 (Mar. 21, 1978). The demand letter here requires that information. Moreover, when Congress added the phrase "or any portion thereof" in 1993,[18] it surely

---

[17]  *See* P.L. 95-429, 92 Stat. 1001, 1002 (1978).

[18]  P.L. 103-123, 107 Stat. 1229 (1993).

intended to prohibit collection of something less than the records of all FFLs nationwide.

Jones argues that "consolidating and centralizing connote a large-scale enterprise relating to a substantial amount of information."  Br. at 38, quoting *Blaustein & Reich*, 365 F.3d at 289.  While the demand letter here meets that criteria, this does not interpret the words in "their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42 (1979).  "Consolidate" means "to combine into one; merge; unite," and "centralize" means "to make central" or "gather together" or "to organize or systematize under one control." *Webster's New World Dictionary, College Edition* (1968).  The demand letter here creates a consolidation and centralization of "any portion" of the records of firearm dispositions.[19]

## II.    ISSUANCE OF THE DEMAND LETTER WAS ARBITRARY AND CAPRICIOUS.

### A.    ATF's Failure to Explain Its Rejection of Known and Obvious Alternatives to Its Decision to Send the Demand Letter to Every Retail Seller in the Four Border States Renders Its Action Arbitrary and Capricious.

Why ATF chose to identify plaintiffs and thousands of other retail sellers as appropriate recipients of the demand letter based only on their location in one of

---

[19] Jones' denial that the rider "forbids '*any* consolidation or centralization of record information' by ATF regardless of scope," Br. at 39 n.10 (citations omitted), disregards that the demand letter went to 8,500 FFLs.

the four Border States was not rationally explained in the administrative record. Although the record demonstrates that different groups of recipients could have been chosen, the issue is not whether a different line was more appropriately drawn by ATF. The issue is whether the line drawn was rational in light of the evidence ATF included in the administrative record.

Jones vaguely alludes to "the centrality of these [state] boundaries to the regulation of firearms sales" as the reason demand letter recipients were identified by state of location. Br. at 44, n. 11. Yet Jones does not explain why grouping retail sellers by state of location was central to ATF's investigation of cross-border trafficking. Jones does not explain why ATF did not include numerous retail sellers outside the four states which it knew had been targets of illegal traffickers, but included plaintiffs and more than 7,000 other sellers in the four states who have not been connected to any rifle recovered in Mexico and traced. There is no rational explanation in the administrative record for the conclusion that multiple sales reports from Tracy Rifle, for example, who conducts business 420 miles from the border and has not been connected by ATF to any rifle recovered in Mexico, would assist ATF in its objective of combatting illegal cross-border firearms trafficking.

ATF undeniably concluded it was important to determine the identity of retail sellers connected to rifles recovered in Mexico. The trace database queries

ATF ran established those connections.  When those connections were revealed

and ATF learned that approximately half of the sellers who sold rifles recovered in

Mexico were located outside the four states, and that nearly five out of every six

retail sellers doing business in the four states had not sold a single rifle recovered

in Mexico and traced, reason dictated that ATF use the evidence to identify

appropriate demand letter recipients regardless of their location. (Aplt. App. 254-

312.)   Instead, ATF simply ensnared every retail seller in the four states without

regard to the evidence it gathered and the rational alternatives that ATF's own

investigation revealed.

Jones relies heavily on the D.C. Circuit's opinion in *NSSF*.  However, that

opinion is flawed for multiple reasons. First of all, the court did not undertake a

"thorough, probing, in depth review" of the administrative record. *Citizens to

Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971).  The court in *NSSF*

provided little analysis of the administrative record, and it is apparent that

deference to ATF was the court's objective rather than ensuring that ATF

"identified all relevant issues [and] gave them thoughtful consideration." *Telocator

Network of America v. FCC*, 691 F.2d 525, 544 (D.C. Cir. 1982).

The court's lack of analysis in *NSSF* and understanding of the administrative

record is demonstrated by its ultimate conclusion:  "ATF's decision to direct its

July 2011 demand letter to FFLs based on their geographic location was therefore

not arbitrary and capricious." *NSSF*, 716 F.3d at 217.  However, ATF did not direct the demand letter to retail sellers based on geographic location.  If it had done so, Tracy Rifle and others geographically distant from the border with Mexico would have been excluded.  ATF clearly rejected geographic proximity to Mexico in favor of state boundaries, and the court in *NSSF* did not require an explanation from ATF in the administrative record.

The *NSSF* court also incorrectly described the proposal made by Mayors Against Illegal Guns regarding a demand for multiple sales reports as not addressing "the proposed demand letter" or the "targeting strategy NSSF proposes." *NSSF*, 716 F.3d at 216.  However, in its proposal, Mayors Against Illegal Guns recommended that ATF consider "requiring dealers to report multiple sales of suspect long guns if in the prior year they had 15 or more traces or three or more traces of suspect long guns." (Aplt. App. 148.)  The demand letter was proposed, in part, as a means to combat the criminal use of rifles used by "the Mexican cartels." *Id*.  That ATF included the report of Mayors Against Illegal Guns in the administrative record is proof that ATF considered the recommendation to be a "significant and viable alternative" requiring consideration. *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987).  Simply because Mayors Against Illegal Guns made other recommendations on other topics in the same report does not render its

recommendation on the scope of the demand letter insignificant and unworthy of a response from ATF.

The *NSSF* court's observation that NSSF failed to "cite to a single page in the administrative record" reflecting "substantial, uncontradicted evidence . . . of rational alternatives to the choice made by ATF" was mistaken. *NSSF*, 716 F.3d at 216. The administrative record in *NSSF* was the same administrative record filed by ATF in this case. The substantial evidence of rational alternatives is found in the trace database queries performed by ATF from which it identified the retail sellers across the country that were connected to rifles recovered in Mexico and traced. (Aplt. App. 253-353.)

The Fifth Circuit's opinion in 10 Ring Precision is similarly flawed. Most notably, the court decided that ATF was not even required to consider alternatives to state boundaries as a basis to identify demand letter recipients because the alternatives were not "significant and viable" or "obvious." 2013 WL 3480202, at * 8. The court wrongly relegated Mayors Against Legal Guns" 38-page "A Blueprint for Federal Action on Illegal Guns" to the status of a "pamphlet" and, like the court in NSSF, incorrectly observed that the report "did not address the proposed demand letter." 2013 WL 3480202, at *8, n. 73. As noted above, the report plainly addresses the perceived problem with firearms trafficking into Mexico and proposed a demand letter requiring multiple sales reports from retail

24

dealers as a means of addressing the problem. (Aplt. App. 148.)  And, again,

ATF's decision to include the report in the administrative record speaks to its

significance.[20]

That Mayors Against Illegal Guns did not specifically comment on ATF's

eventual decision to demand multiple sales reports from all retail sellers in the

Border States does make its proposal insignificant or not viable.  To the contrary:

the proposal made by Mayors Against Illegal Guns addressed the subject of who

among federally licensed dealers should be required to report multiple sales of

rifles in order to combat gun crimes both here and in Mexico. Given their presence

in the administrative record, the report and recommendation was presumptively

considered by ATF in reaching its decision, yet the record is silent on why ATF

rejected the proposed alternative to state boundaries.

Finally, both the *NSSF* and *10 Ring Precision* courts were wrong to accept

defendant's argument that agency decisions are reviewed under a more deferential

---

[20] An administrative record is to contain all relevant information on which the
agency relied or should have relied in making the challenged decision. *MG
Altus Apache Co. v. United States*, 102 Fed. Cl. 744, 752 (Fed. Cl. 2012)
supplemented, 11-538C, 2013 WL 3064808 (Fed. Cl. May 24, 2013).  The
administrative record in *10 Ring Precision*, like the administrative record in this
case, was certified by ATF to contain the "materials . . . underlying ATF's
decision to issue the July 12, 2011 demand letter." (Aplt. App. 0007 (District
Court Docket Entry 36-1, Administrative Record Certification).)  The Mayors
Against Illegal Guns report was relevant information that ATF either relied on
or should have relied on.  The courts in *NSSF* and *10 Ring Precision* were
wrong to treat the report as insignificant.

standard of review when promulgating new regulations than when revising or

rescinding existing regulations. Jones makes the same unsupported argument in

this case, yet ignores that both types of agency decisions are "subject to the same

test." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*.,

463 U.S. 29, 41 (1983); *Action on Smoking and Health v. C.A.B*., 699 F.2d 1209,

1216 (1983) (agency action rescinding and promulgating regulations are

"reviewable in the same manner."); *cf. International Ladies Garment Worker's*

*Union v. Donovan*, 722 F.2d 795, 818 (D.C. Cir. 1983) (rejecting argument that

regulation not examined for forty years should be reviewed more deferentially).

Here, as in any review of an agency decision, the court is to look for evidence of

reasoned decision making, which includes consideration of reasonable and known

options and explanation for their rejection. *Id.* Agency decision making that does

not meet this standard is arbitrary and capricious and should be overturned.

    **B.    Portions Of The Administrative Record Should Have Been Excluded.**

Portions of the administrative record involving the tracing of firearms by

Mexican authorities should have been excluded as unlawful. *See* Peterson Br. at

46-55. The cases holding that judicial review must be based on the full

administrative record (Br. at 47) did not consider whether portions may be

excluded if they were unlawfully created.

Jones argues that § 923(g)(7) is not limited to domestic "bona fide criminal investigations," and does not bear on demand letter requirements.  Br. at 47-48.  He simply ignores the "legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application . . . ."  *Small v. United States*, 544 U.S. 385, 389 (2005).[21]

Jones asserts that Congress appropriated funds for foreign traces, Br. 48, but cites no enactment doing so.  The existence of committee reports on bills that were never voted on adds nothing.  *See 10 Ring Precision*, 2013 WL 3480202, at *9 & n.77.

Jones disputes that the Privacy Act bars disclosure of information concerning the purchasers of firearms to Mexican authorities, "because the documents in question were generated from information provided by Mexican authorities to ATF," not from records of a federal agency.  Br. at 49.   But the trace information provided to Mexican authorities is from ATF's "system of records" because it is part of "a group of any records under the control of" ATF "from

---

[21]  The Fifth Circuit stated that "the Mexican government conducting traces using ATF's database is simply not an 'extraterritorial application' of the GCA."  *10 Ring Precision*, 2013 WL 3480202, at *9 n.76.  But a foreign government conducting traces is anything but domestic.

which information is retrieved by the name of the individual . . . ."  5 U.S.C. §
552(a)(5).[22]

Jones asserts that ATF has complied with the "routine use" exemption
because it published a notice stating that records may be disclosed, *inter alia*, to
foreign law enforcement authorities.  Br. at 49.  However, a "routine use" means
the use of a record "for a purpose which is compatible with the purpose for which
it was collected," § 552a(a)(7), which does not include disclosure of the identities
of firearm purchasers to Mexican authorities.

Finally, no evidence exists that the funding of ATF's eTrace 4.0 system
complied with 31 U.S.C. § 9703(g)(4)(C), which required the Secretary to notify
the Appropriations Committees of both Houses of Congress at least 15 days in
advance of the $4,500,000 expenditure.[23]   No factual basis exists to create the

---

[22]  The Fifth Circuit states: "The Firearms Tracing System is not a 'system of
records,' because traces are conducted by entering an identifying characteristic
of the firearm, not the individual, into ATF's database."  *10 Ring Precision*,
2013 WL 3480202, at *9.  The end result of entering the firearm information is
to trace the firearm to the individual retail purchaser.

[23]  Contrary to Jones (Br. at 49, n.14), this argument was properly raised in
Peterson's Reply to Jones' opposition to Peterson's motion to exclude, at 9
(Doc. 58).

"presumption of regularity" that the officials "properly discharged their official duties." *See United States v. Chemical Foundation,* 272 U.S. 1, 14-15 (1926).[24]

Accordingly, the portions of the administrative record involving the tracing of firearms by Mexican authorities should have been excluded as unlawfully created.

\*     \*     \*

---

[24] The Fifth Circuit rejected the above based on *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001), but that court's single sentence on the subject simply cited *Chemical Foundation*, 272 U.S. at 14-15, which explains the rule more fully. *10 Ring Precision,* 2013 WL 3480202, \*9 n.79.

## <u>CONCLUSION</u>

For all of the foregoing reasons, this Court should reverse the judgment of the court below, and remand with instructions to grant summary judgment for Plaintiffs, or for other appropriate proceedings.


Respectfully submitted,

*/s/ James B. Vogts*
James B. Vogts
SWANSON, MARTIN & BELL, LLP
330 North Wabash Avenue, Suite 3300
Chicago, Illinois  60611
(312) 923-8266

**Counsel for Dale Rutherford, doing business as The Cop Shop, and Tracy Rifle and Pistol, Inc.**


*/s/ Stephen Porter Halbrook*
Stephen Porter Halbrook
Law Office of Stephen P. Halbrook
3925 Chain Bridge Road
Suite 403
Fairfax, VA 22030
(703) 352-7276

**Counsel for Ron Peterson Firearms, LLC**

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 6,877 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).   Further, this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in in proportionally spaced typeface using Microsoft Word 2003 in 14-point Times New Roman font.

*/s/ James B. Vogts*
James B. Vogts

## CERTIFICATE OF COMPLIANCE WITH PRIVACY REDACTIONS

In accordance with Circuit Rule 25.5 and Fed. R. App. P. 25(a), the undersigned certifies all required privacy redactions have been made to the attached brief.

*/s/ James B. Vogts*
James B. Vogts

## CERTIFICATION OF VIRUS SCANNING

In accordance with the ECF User Manual, Section II, Policies and Procedures for Filing via ECF, part I(c), pages 11-12, the undersigned states this brief, as submitted digitally, has been scanned for viruses using the most recent

version of Symantec Endpoint Protection, which was last updated on July 25, 2013, and according to that program, this brief is free of viruses.

/s/ James B. Vogts
James B. Vogts

## CERTIFICATE OF ELECTRONIC AND HARD COPIES

In accordance with the ECF User Manual, Section II, Policies and Procedures for Filing Via ECF, Part I(b), pages 11-12, the undersigned certifies the electronically filed brief is identical to the seven hard copies submitted to the Court.

/s/ James B. Vogts
James B. Vogts

July 25, 2013

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rule of Appellate Procedure 25(d), and Circuit Rule 25.4, I hereby certify that on this 25th day of July, 2013, the foregoing brief was served upon the counsel of record via email through the Court's CM/ECF system, as indicated below:

**Michael S. Raab**
Civil Division, Appellate Staff
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 514-5428
Email: michael.raab@usdoj.gov

**Anisha S. Dasgupta**
Civil Division, Appellate Staff
U.S. Department of Justice
PO Box 978, Ben Franklin Station
Washington, DC 20044
(202) 514-5428
Email: anisha.dasgupta@usdoj.gov

*Attorneys for Defendant-Appellee*

*/s/ James B. Vogts*
James B. Vogts
SWANSON, MARTIN & BELL, LLP
330 North Wabash Avenue, Suite 3300
Chicago, Illinois  60611
(312) 923-8266

*Counsel for Dale Rutherford, doing business as The Cop Shop, and Tracy Rifle and Pistol, Inc.*

July 25, 2013